TERRY GENE PAULEY,

*etc., et al.*

*v.*

JOHN H. KELLY,

*Treasurer, State of West Virginia,*

*et al.*

(No. 14036)

Decided February 20, 1979.

*Daniel F. Hedges, Peter J. Nickles and Paul A. Zevnik,
Covington & Burling, Richard S. Kohn and David C.
Long* for appellants.

*Chauncey H. Browning,* Attorney General, *F. Layton
Cottrill, Jr.,* Assistant Attorney General, for appellees.

HARSHBARGER, JUSTICE:[1]

Appellants are parents of five children who attend the public schools of Lincoln County. They filed this action for declaratory judgment in the Circuit Court of Kanawha County on behalf of themselves and as a class action on behalf of the other students in the Lincoln County school system. Defendants are the State Treasurer and State Auditor, the members of the West Virginia State Board of Education and the State Superintendent of Schools.

The Pauleys allege that our system for financing public schools violates West Virginia's Constitution by denying plaintiffs the "thorough and efficient" education required by Article XII, Section 1, and by denying them equal protection of the law. They particularly direct us

---

[1] The writer acknowledges the valuable contributions by his Brother, Thomas B. Miller, especially in the discussions about procedure commencing *ante* at 4; about equal protection, *ante* at 6; and issues for development upon remand, *ante* at 40.

to inequalities that exist in secondary education opportunity and achievement, created by markedly out-of-balance annual funding, facilities, curriculum and personnel of schools in property-poor counties, such as Lincoln, compared with those in more wealthy counties in the State.

The first section of our Constitution's education article is:

> "The legislature shall provide, by general law, for a thorough and efficient system of free schools."

The Constitution's equal protection mandates are:

> "No person shall be deprived of life, liberty, or property, without due process of law . . . ." [Article III, Section 10][2]

and

> "The courts of this State shall be open, and every person, for an injury done to him, in his person, property or reputation, shall have remedy by due course of law; and justice shall be administered without sale, denial or delay." [Article III, Section 17][3]

The case was decided on pleadings, admissions, affidavits and statistical material from public documents. No testimony was offered. Plaintiffs moved for summary judgment; defendants moved to dismiss because the complaint did not state a cause of action.

---

[2] Invidious classifications are forbidden by this Clause in the same manner as by Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution. *See State ex rel. Harris v. Calendine,* ____ W.Va. ____, 233 S.E.2d 318 (1977); *O'Neil v. City of Parkersburg,* ____ W.Va. ____, 237 S.E.2d 504 (1977); *see also Linger v. Jennings,* 143 W.Va. 57, 99 S.E.2d 740 (1957).

[3] Appellants cite Article III, Section 10. We have recently stressed the equal protection aspects implicit in Article III, Section 17, in *State ex rel. Piccirillo v. City of Folansbee,* ____ W.Va. ____, 233 S.E.2d 419 (1977).

The court then made factual findings to the effect that the Lincoln County school system is inadequate,[4] appar-

_____

[4] These are the court's findings:

"(a) This is a class action brought by Lincoln County public school children individually and in behalf of all other school children in the Lincoln County school district.

"(b) The facilities, curricula and other services provided by schools in West Virginia counties that have property wealth greater than that of Lincoln County are more extensive, diverse and of a better quality than those provided in Lincoln County.

"(c) The facilities, curricula, and other services provided by Lincoln County schools fail to meet many of the [West] Virginia Comprehensive Program, the West Virginia *Standards for Classification of Secondary Schools* and/or the *NCA Policies and Standards*.

"(d) Physical plant inadequacies in most of the County's schools are so significant as to constitute potential threats to the health and welfare of students.

"(e) The absenteeism and withdrawal rates in Lincoln County schools are much higher than such rates in schools located in counties with greater property wealth.

"(f) The educational success rate of Lincoln County students, as measured by test scores or the number of students who go on to obtain additional education or training after graduation from high school is much lower than that of students from counties with greater property wealth.

"(g) The scores of Lincoln County students on standardized tests fall below the state and national averages in virtually every category.

"(h) A strong, positive correlation exists between the amount of educational expenditures in West Virginia schools and the achievement or educational success rate of the students in West Virginia schools.

"(i) Counties with relatively little local property wealth like Lincoln County cannot offer the type and quality of educational program offered by counties with greater local property wealth since the amount of local revenue a county may raise for education is dependent under the West Virginia system of school finance on the amount of its local property wealth.

"(j) The funds provided by the State and Federal government to supplement local revenues do not eliminate the disparity between property-poor counties like Lincoln County and counties with greater local property wealth in terms of the educational dollars available to them.

"(k) A specific area of inadequacy in Lincoln County is special education. Some Lincoln County children who are deaf and blind must attend a residential institution outside Lincoln County in order to exercise their right to education and the provision of one

ently by comparison with four other counties: Kanawha, Marshall, Brooke and Hancock.

Its legal conclusions were that State government has not created a thorough and efficient system of public schools in Lincoln County, but has met "the constitutional mandate in some counties...." Also:

"[T]here has been no evidence that public school children residing in those [property-poor] counties are necessarily poorer than such children who reside in counties with higher overall property values. In the absence of such evidence, the classification here has not been shown to be based on social class or wealth of the plaintiff class, but merely to be based on geography of county lines. The nature of the classification thus does not fall into that category of classifications which are automatically considered to be suspect." [R. 330]

So equal protection guarantees were inapplicable.

The court dismissed the complaint, denied plaintiffs' motion for summary judgment, and plaintiffs appealed, asserting:

"1. The Circuit Court should have granted the relief requested by plaintiffs in light of its findings of fact and its conclusions of law that Lincoln County schools are inadequate under the 'thorough and efficient' constitutional standard of the State of West Virginia.

"2. The Circuit Court should have granted the relief requested by plaintiffs in light of its findings that significant disparities exist among West Virginia counties in the quality and extent of educational services provided, thus constituting a violation of equal protection and due process principles safeguarded by the West Virginia Constitution." [Appellants' Brief at 8]

class of twenty for all learning disabilities does not comply with the statutory requirements of Chapter 18, Article 20, Section 1 of the West Virginia Code."

We note what may have been a fundamental procedural error. Apparently defendants' motion to dismiss was granted because plaintiffs had not demonstrated, in their affidavits, admissions and other documents, that the poor school system in Lincoln County is a product of the present school financing system as they alleged. This may have been sufficient reason to deny plaintiffs' motion for summary judgment, but could not justify granting a motion to dismiss against them. A motion to dismiss is designed simply to test the legal sufficiency of a complaint. We have held that such motions are not favored and in considering them, plaintiffs' factual allegations must be construed favorably to them and considered for purposes of the motion to be true. *John W. Lodge Dist. Co. v. Texaco, Inc.,* ___ W.Va. ___, 245 S.E.2d 157 (1978).

The trial court in its memorandum opinion recognized that the plaintiffs had asserted valid constitutional challenges to the present school financing system. It was not their legal theories that were deficient, and therefore a motion to dismiss was improper.

It is true that defendants filed an affidavit by Dr. James T. Ranson which questioned some of plaintiffs' factual allegations, but the court did not consider it to be a summary judgment request by defendants under *Chapman v. Kane Transfer Co.,* ___ W.Va. ___, 236 S.E.2d 207 (1977). Even if it had elected to do so, summary judgment for defendants would have been inappropriate because defendants' affidavit did no more than raise issues of material fact. We have held that even though both parties move for summary judgment, the court cannot thereby dispose of the case where disputed issues of facts exist. *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York,* 148 W.Va. 160, 133 S.E.2d 770 (1963).

The case must be remanded for further evidentiary development and, because there are significant and far-reaching public issues involved, it is advisable that we propose certain guidelines to the Circuit Court. We shall

678

analyze applicable constitutional standards and then review the State's role in education and identify areas that require evidentiary development to allow judgment of the State's performance of its role.

## THE CONSTITUTIONAL ISSUES
### *Equal Protection*

The trial court correctly recognized that federal Fourteenth Amendment equal protection rights are not available to children seeking educational equality. *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 36 L.Ed.2d 16, 93 S.Ct. 1278 (1973).[5] It properly

[5] The Texas school financing plan was attacked in *Rodriguez* on much the same theory as is done in this case. The claim was made that because a part of the total educational expenditure came from property taxes raised in each of the counties, a discriminatory class was created against those persons residing in school districts that had low property tax bases and even with an equalizing state aid formula had substantially less money per pupil than wealthy districts.

The Court 5-4 decided that education is not, from a federal standpoint, a fundamental right subject to strict scrutiny for equal protection deficiencies, and therefore that Texas was only required to show a rational basis for its educational funding system. It concluded that a rational basis was the element of local control that the property tax base gave to its school financing system.

Dissenters wrote that education is a fundamental right, and consequently, in justifying its financing system, the state had to show a compelling state interest to justify inequities. They concluded that the state's failure to distribute its general tax funds for education to districts in a manner to adjust for disparities in local property tax revenues violated equal protection principles.

Our examination of *Rodriguez* and our research in this case indicates an embarrasssing abundance of authority and reason by which the majority might have decided that education is a fundamental right of every American. *See* Thorough and Efficient *infra* at 10; Gammon, *Equal Protection of the Law and San Antonio Independent School District v. Rodriguez*, 11 Val. U. L. Rev. 435, 443 (1977); McCarthy, *Is the Equal Protection Clause Still a Viable Tool for Effecting Education Reform?*, 6 J.L. & Ed. 159, n. 53 at 168 (1977); Porras, *The Rodriguez Case—A Crossroad in Public School Financing*, 26 Tax Law. 141, 144–54 (1972); 26 U. Fla. L. Rev. 155, 157 (1973); *compare Brown v. Board of Education*, 347 U.S. 483, 98 L. Ed. 873, 74 S.Ct. 686, 38 A.L.R.2d 1180 (1954); *see also The Universal Declaration of Human Rights* approved December 10, 1948, by the General Assembly of the United Nations, which appears to

concluded that a state is not constrained by the federal constitutional standard, but must examine its own constitution to determine its education responsibilities. It relied upon similar analyses made by other state courts. *Horton v. Meskill*, 172 Conn. 615, 376 A.2d 359 (1977); *Robinson v. Cahill*, 62 N.J. 473, 303 A.2d 273 (1973). We have stated that we may interpret our own Constitution to require higher standards of protection than afforded by comparable federal constitutional standards. *Adkins v. Leverette*, ____ W.Va. ____, 239 S.E.2d 496, 499 (1977).

*Robinson* affirmed a lower court judgment, holding the New Jersey school financing statute to be unconstitutional. The case has considerable relevance to our jurisdiction, because New Jersey's constitution contains a thorough and efficient clause and an equal protection section. We will mention the former later.

The court discussed equal protection and concluded that its legislature was required to provide a thorough and efficient education system throughout the state; that this made education a fundamental, constitutionally mandated right in New Jersey; and therefore the educational funding system must be strictly scrutinized to see if there was a compelling state interest served by any statutorily created inequalities.[6]

---

proclaim education to be a fundamental right of everyone, at least on this planet.

The Court apparently did not have presented to it facts about those states whose very admission into the Union was conditioned upon their promises to constitutionally secure education to their citizens: Alaska, Arizona, Colorado, Hawaii, Idaho, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, South Dakota, Texas, Utah, Washington and Wyoming. Several states were presented with the option of receiving land grants from the federal government for the use of public schools upon their admission into the Union: Alabama, Arkansas, Illinois, Indiana, Iowa, Kansas, Minnesota, Missouri, Ohio, Oregon and Wisconsin. 1–8 *The Federal and State Constitution, Colonial Charters, and Other Organic Laws of the States, Territories, and Colonies Now or Heretofore Forming The United States of America* (F. Thorpe ed. 1909)

[6] This is the traditional equal protection standard which we have recognized in *Cimino v. Board of Education of County of Marion*, ____ W.Va. ____, 210 S.E.2d 485, 490 (1974):

However, the *Robinson* court refused to place entire reliance on its equal protection clause to test the state's school financing formula, because it recognized there may be instances where the state must spend unequal amounts among the various school districts or counties:

"We hesitate to turn this case upon the State equal protection clause.[7] The reason is that the equal protection clause may be unmanageable if it is called upon to supply categorical answers in the vast area of human needs, choosing those which must be met and a single basis upon which the State must act. . . ." [62 N.J. at 492, 303 A.2d at 283]

"This is not to say that public education is not vital. Of course it is. Rather we stress how difficult it would be to find an objective basis to say the equal protection clause selects education and

"Whether a statute or governmental action violates the Equal Protection Clause is a determination made by the application of one of two constitutional tests. The more demanding test relates to statutes which impinge upon sensitive and fundamental rights and constitutional freedoms, such as religion and speech. In order to uphold such a statute, a reviewing court must find that a compelling state interest is served by the classification. Weber v. Aetna Casualty & Surety Company, 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768; Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600.

"In all other instances, the constitutionality of a statute, challenged under the Equal Protection Clause, is subject to the traditional standard requiring that the state law be shown to bear some rational relationship to legitimate state purposes. San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16. Under this test, the court must consider whether the classification is a rational one based on social, economic, historic or geographical factors; whether the classification bears a reasonable relationship to a proper governmental purpose; and whether all persons within the classes established are treated equally."

We have applied this standard to strike down a property qualification for candidates for public office. *State ex rel. Piccirillo v. City of Follansbee, supra.*

[7] But the court's hesitancy seems predicated on a presumption that equal protection equates with equal expenditure, and of course this is not true. Equal protection, applied to education, must mean an equality in substantive educational offerings and results, no matter what the expenditure may be.

demands inflexible statewide uniformity in expenditure. . . ." [62 N.J. at 495, 303 A.2d at 284]

We find merit in this approach that avoids narrow strictures upon education financing, a task that is certainly multi-faceted and not easily categorized.

California has used its equal protection clause on two occasions to strike down state financing formulas which were based in part on a district property tax system that caused districts with low property bases to receive less educational funds. *Serrano v. Priest*, 18 Cal.3d 728, 135 Cal. Rptr. 345, 557 P.2d 929 (1976); *Serrano v. Priest*, 5 Cal.3d 584, 96 Cal. Rptr. 601, 487 P.2d 1241 (1971).

## *Thorough and Efficient*[8]

Education sections in state constitutions (there is, of course, no specific reference to public education in the United States Constitution)[9] can be classified according to whether they reasonably may be considered to require legislatures to provide for public school systems of specified quality, or simply say that public school or uniform public school systems may or shall be established.[10]

---

[8] We have devoted extraordinary attention to the Thorough and Efficient Clause research because the area has been unexplored, and we found useful but heretofore unused guidance in other states' law about the Clause.

[9] For views of federal aid to education, *see* J. Berke & M. Kirst, *Federal Aid to Education* (1972); P. Burrup, *Financing Education in a Climate of Change* (1974); W. Garms, J. Guthrie & L. Pierce, *School Finance: The Economics and Politics of Public Education* (1978); H. Kursh, *The United States Office of Education* (1965); 14 *The Reference Shelf 10, Federal Aid for Education* (J. Johnsen ed. 1941); Ford, *The Constitutional Implications of Federal Aid to Higher Education*, 1 J.L. & Educ. 513 (1972).

[10] They can also be grouped by whether they make state or local government responsible for education and by the manner in which they require education financing (often affecting the state/local grouping). *No* state constitution ignores education, although Massachusetts nearly does, confining its attention principally to Harvard College.

We have extracted the phraseology from those state constitutions that seem not to set any quality levels, and include them in Appendix I at 54.

Constitutional mandates that legislatures provide thorough and efficient education systems which is the traditional quality requirement we have found[11] are in the Ohio, Minnesota, Maryland, Pennsylvania, New Jersey, Illinois (from 1870 until 1970), and West Virginia Constitutions. Colorado, Idaho and Montana require thorough systems; and Arkansas, Texas, Kentucky, Delaware, Virginia (until 1971), and Illinois (since 1970), efficient systems.[12]

It has been instructive to us to examine all debates in the constitutional conventions that produced thorough and efficient education clauses, attempting to find definitions, explanations of intentions; to find whether the words were hyperbole or were meant to have legal sig-

---

[11] "Efficient" may also be an anti-extravagance admonition.

[12] In 1971, Virginia's education clause was changed in part to:

"§ 1. Public schools of high quality to be maintained.-The General Assembly shall provide for a system of free public elementary and secondary schools for all children of school age throughout the Commonwealth, and shall seek to ensure that an educational program of high quality is established and continually maintained.

"§ 2. Standards of quality; State and local support of public schools.-Standards of quality for the several school divisions shall be determined and prescribed from time to time by the Board of Education, subject to revision only by the General Assembly."

Illinois' 1970 clause is:

"§ 1. GOAL-FREE SCHOOLS

"A fundamental goal of the People of the State is the educational development of all persons to the limits of their capacities.

"The State shall provide for an efficient system of high quality public educational institutions and services. Education in public schools through the secondary level shall be free. There may be such other free education as the General Assembly provides by law.

"The State has the primary responsibility for financing the system of public education."

Neither of these states' new constitutional educational clauses have had judicial interpretation. We find no evidence that Virginia and Illinois courts' performances in applying their former standards precipitated the particularity of wording of the recently adopted amendments. *But see People ex rel. Russell v. Graham*, 301 Ill. 446, 134 N.E. 57 (1922); *Fiedler v. Eckfeldt*, 335 Ill. 11, 166 N.E. 504 (1929); *County School Board of Prince Edward County v. Griffin*, 204 Va. 650, 133 S.E.2d 565 (1963).

nificance (as one might presume every constitutional pronouncement to have).

Our research produced useful dialogues in the Ohio and West Virginia Conventions, and we have included abbreviated parts in this opinion.

We have also examined all the cases applying "thorough and efficient," "thorough" or "efficient" constitutional standards (or refusing to apply them) decided in the fifteen states, and have culled and included herein mention of those that help us find how courts have treated the Thorough and Efficient Clause.

*Constitutional Debates*

The 1851 Ohio Constitution was the first to use the words "thorough and efficient" to describe the education system mandated to be established by its legislature. Article VI, Section 2, adopted by the Ohio Constitutional Convention on March 8, 1851, was:

> "The General Assembly shall make such provisions, by taxation or otherwise, as with the income arising from the school trust fund, *will secure a thorough and efficient system of common schools throughout the State*; [emphasis supplied]; but no religious, or other sect or sects, shall ever have any exclusive right to, or control of any part of the school funds of this State, [*nor shall the rights of conscience be in any case interfered with.*]" [Emphasis in original] [*Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Ohio, 1850-51*, at 843][13]

This had been the third section of the Convention's education committee's second report, which, on February 24, 1851, was in these words when debated by the Convention:

> "The General Assembly shall make such provisions, by taxation or otherwise, as, with the income arising from the school trust funds, will secure a thorough and efficient system of com-

---

[13] Hereinafter referred to as *Ohio Debates*.

mon schools throughout the State, and place the means of instruction in the common branches of education, for a suitable portion of each year, within the reach of all the children therein, of suitable age and capacity for learning. . . ." [*Ohio Debates* at 698]

There are portions of the debates about the February 24 report that are enlightening (though they are available only in summary, and not verbatim):

"MR. ARCHBOLD ... hoped to see common schools advance, not only to meet such demands as are now made upon them, but to meet higher and greater requisitions. Then the common of the future will need to be far above the common of the present. *He wanted to see a system of schools as perfect as could be devised, and to see it improve so as to keep pace with the most rapid progress of the most rapid element of our social or political constitution. . . .*" [*Ohio Debates* at 698] [Emphasis supplied]

The inability of poorer areas to support schools with the same munificence as wealthier areas was discussed, and when an amendment that would have required six-month school terms was offered to the February 24 report, one proponent's remarks fix the state's responsibility to all the children:

"MR. BARNET of Montgomery. I am in favor of prescribing the longest time for sustaining common schools. I only regret that I cannot have the opportunity to vote for sustaining common schools nine months in the year. *I consider, sir, that the children of the State are the property of the State; and that it is the duty of the State to educate them for usefulness. And that the funds of the State are amply sufficient to educate all the children of the State, no man in his senses can doubt. . . .*" [*Ohio Debates* at 703] [Emphasis supplied]

There was no explicit definition of the words "thorough and efficient" that appeared in the final committee report which the 1851 Ohio Convention adopted. The

tenor of the discussion, however, by those advocating the entire education section as it was finally adopted, leaves no doubt that excellence was the goal, rather than mediocrity; and that education of the public was intended to be a fundamental function of the state government and a fundamental right of Ohioans.

The Minnesota Constitutional Convention of 1857 was next to include "thorough and efficient" in its education article. It did, in fact, apparently emulate Massachusetts[14] and Ohio phraseology, without debate useful to us.

> "Section 1. Wisdom and Knowledge, as well as Virtue, are essential to the preservation of rights and liberties of the people, therefore: It shall be the duty of the Legislature of this State to cherish the interests of Education in Literature and Science, and to establish a general system of Public Schools; to encourage public and private instruction for the promotion of Agriculture, Arts, Science, Commerce, Trade, Manufactories, and Natural History of the Country; and to adopt all means which they may deem necessary and proper to secure to the people the advantages and opportunities of Education.

> . . . .

---

[14] The 1780 Massachusetts provision intones:

"Wisdom, and knowledge, as well as virtue, diffused generally among the body of the people, being necessary for the preservation of their rights and liberties; and as these depend on spreading the opportunities and advantages of education in the various parts of the country, and among the different orders of the people, it shall be the duty of legislatures and magistrates, in all future periods of this Commonwealth, to cherish the interests of literature and the sciences, and all seminaries of them; especially the university at Cambridge, public schools and grammar schools in the towns; to encourage private societies and public institutions, rewards and immunities, for the promotion of agriculture, arts, sciences, commerce, trades, manufactures, and a natural history of the country; to countenance and inculcate the principles of humanity and general benevolence, public and private charity, industry and frugality, honesty and punctuality in their dealings; sincerity, good humor, and all social affections, and generous sentiments among the people." [Mass. Const. Chap. V, Sec. II]

> "Section 3. The Legislature shall make such provisions, by taxation or otherwise, as, with the income arising from the School Fund, will secure a thorough and efficient system of Schools in each Township in the State." [*The Debates and Proceedings of the Minnesota Constitutional Convention* at 437-38]

We found no enlightening dialogue in any of the other conventions from which education articles with mandates for state thorough and efficient school systems emanated, to aid us in definition or delineation of the terms.[15]

---

[15] Records of the acrimonious debates and proceedings of the Texas Constitutional Convention of 1875 disclose that of all the states whose constitutions' education article require thorough, efficient (or either) public school systems, Texas alone had serious anti-public school sentiment expressed by delegates.

Objections ranged from those predicated upon tax-prohibitive post-Civil War poverty, to those that posited public shools to interfere with sacred parental rights. One proponent characterized the argument by an anti-public school man to be "... more fitted for an asylum than for a constitutional convention." [*Debates in the Texas Constitutional Convention of 1875* at 223] [Hereinafter *Texas Debates*]

The nineteen delegates who opposed free schools were called "a band of old fogies" and the education committee's majority report as "a fraud on the people." [*Texas Debates* at 230-31] The disagreement caused appointment of a special committee to reconcile, or stifle, the conflicts (the education committee had issued its report and there were two minority reports). It recommended that "[I]t shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools." [*Texas Debates* at 336]

A speaker referred to a "sacred compact entered into by and between the people of Texas and the Congress of the United States;" "[T]hat the Constitution of Texas shall never be so amended as to deprive any citizen or class of citizens of the United States of the school rights and privileges secured by the Constitution of said State;" "A promise to comply with the compact determined our admission into the Union." [*Texas Debates* at 338]

Texas in 1875 may have been poor in worldly goods, but she certainly abounded in orators. We recommend the debates to any student of oration, but find therein only one hint of a definition of "efficiency." One speaker remarked that to establish free schools

West Virginia was the third state to incorporate the thorough and efficient mandate in its basic law. Our "Convention to frame a Constitution for the proposed new State of Kanawha" convened in Wheeling on November 26, 1861, and one week later received the first of several proposed educational articles referred by its education committee.[16]

The committee's first report was presented on January 22, 1862, by Gordon Battelle, its chairman.[17] Battelle prevailed on every crucial issue that would have diluted the State-unit plan; that would have limited general taxation and expenditures by the State government for schools; or even would have given the Legislature a specific period of grace in which to establish a system.[18]

for one, two, or three months in a year would be inefficient. [*Texas Debates* at 338] The clause, as enacted, was:

"A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for support and maintenance of an efficient system of public free schools." [Texas Const. Article VII, Section 1]

[16] *Debates and Proceedings of the First Constitutional Convention of West Virginia 1861-1863* [hereinafter *Debates*] is particularly interesting because it reveals wisdom, foresight and perception which has proved amazingly accurate. There were lengthy dialogues, for example, about the merits of constitutionally requiring taxes on corporations to be devoted to schools—debates during which out-of-State owner exploitation of the State's wealth was predicated by proponents, and the depressing effect of such taxes on attracting out-of-State capital was prophesied by opponents. The currency of the problem is illustrated in the series of newspaper articles by Tom D. Miller and others, titled *Who Owns West Virginia?*, reprinted in booklet form by the Huntington Publishing Company in 1975.

[17] *See Debates*, Vol. 1, Introduction at 60–61, for a brief biography of Reverend Battelle. The genesis of this report, and the divisions in the Convention about public school financing that surfaced in the arguments about Section 1, are discussed in some detail in Ambler, *A History of Education in West Virginia* (1951) at 134-38. Excerpts from Ambler about the general history of school financing in the State are attached as Appendix II at 59.

[18] To illustrate, note this repartee between Stuart of Doddridge County and Battelle:

"MR. STUART OF DODDRIDGE. The gentleman should recollect that when he goes to tax people in their townships that every man

The result was an article that included as its second section:

> "The Legislature shall provide, as soon as practicable, for the establishment of a thorough and efficient system of free schools. They shall provide for the support of such schools by appropriating thereto the interest of the invested school fund; the net proceeds of all forfeitures, confiscations and fines accruing to this State under the laws thereof; and by general taxation on persons and property or otherwise. They shall also provide for raising, in each township, by the authority of the people thereof, such a proportion of the amount required for the support of free schools therein as shall be prescribes by general laws. [Debates, Vol. III at 881]

On January 16, 1872, a second West Virginia Constitutional Convention met in Charleston[19]. The Journal of the Convention contains no debates, but recites all motions, committee reports, resolutions, and votes thereon. Every effort to dilute the mandate was defeated; and it

---

will insist at least that he shall have a school sufficiently convenient to him to accommodate his children; otherwise you will have a difficulty there. No man will want to be taxed for a school entirely out of his reach. If you go into this general system, you must accommodate everybody; get it within reach of every man. . . . Now, we are not situated as many of these states that have adopted this system, where their country is all smooth and cultivated and thickly settled. . . .

"BATTELLE: There is just one word I want to say and that is this; I beg the gentleman from Doddridge and all the rest here to get out of their minds the idea that all the mountains in the world are in West Virginia. That is not so. They have mountains elsewhere; and they have some moutains of the biggest and the highest where this school system has been and is in flourishing operation ... It is very clear, however, that complaining will never succeed in bringing it to every man's door." [*Debates*, Vol. II at 1106-1107]

[19] The first West Virginia Convention may have been distinctive among any constitutional conventions in this respect: after a formal invitation by the Trustees of the Fifth Ward School in Wheeling, who were apparently very proud of their facility, the entire Convention visited the school on December 9, 1861, to observe its operation. *Debates*, Vol. I at 144-46.

was made even more prominent than in the 1863 Constitution.

Its article on education, Article XII, adopted when the Constitution was approved by the Convention on April 9, 1872, and that fall adopted by the people, remains essentially for our purposes unchanged to this day. The first section is the unequivocally and unencumbered statement that:

> "The legislature shall provide, by general law, for a thorough and efficient system of free schools."[20]

*Thorough and Efficient Cases*

Each of the fifteen states' appellate courts, and some federal courts, have applied the thorough and/or efficient clauses.

In all of these states, the clauses have been held to be absolutely mandatory upon legislatures.[21]

They all have found the clause to make education a state, rather than local, responsibility.[22]

---

[20] The entire education article and other constitutional sections that affect education are in Appendix III at 63.

[21] *Kuhn v. Board of Education of Wellsburg*, 4 W.Va. 499 (1871); *Manley v. Moon*, 177 Ark. 260, 6 S.W.2d 281 (1928); *In re Kindergarten Schools*, 18 Colo. 234 (1893); *In re School Code of 1919*, 30 Del. 406, 108 A.39 (1919); *Fenton v. Bd. of Comm'rs of Ada County*, 20 Idaho 392, 119 P. 41 (1911); *People ex rel. Russell v. Graham*, 301 Ill. 446, 134 N.E. 57 (1922); *City of Louisville v. Commonwealth*, 134 Ky. 488, 121 S.W. 411 (1909); *Revell v. Annapolis*, 81 Md. 1 (1895); *Associated Schools of Independent Dist. No. 63 v. School Dist. No. 83*, 122 Minn. 254, 142 N.W. 325 (1913); *Evers v. Hudson*, 36 Mont. 135, 92 P. 462 (1907); *Pingry Corporation v. Township of Hillside*, 46 N.J. 457, 217 A.2d 868 (1966); *Miller v. Korns*, 107 Ohio St. 287, 140 N.E. 773 (1923); *Malone v. Hayden*, 329 Pa. 213, 197 A. 344 (1938); *Moseley v. City of Dallas*, Tex. Com. App., 17 S.W.2d 36 (1929); *Board of Sup'rs of King and Queen County v. Cox*, 155 Va. 687, 156 S.E. 755 (1931).

[22] *Kuhn v. Board of Education of Wellsburg, supra; Dickinson v. Edmondson*, 120 Ark. 80, 178 S.W. 930 (1915); *Florman v. School Dist. No. 11*, 6 Colo. App. 319, 40 P. 469 (1895); *In re School Code of 1919, supra; American Nat. Bank of Idaho Falls v. Joint Independent School Dist. No. 9*, 61 Idaho 405, 102 P.2d 826 (1940); *Fiedler v. Eckfeldt*, 335 Ill. 11, 166 N.E. 504 (1929); *City of Louisville v. Com-*

690

Broad legislative authority and discretion have been acknowledged,[23] and courts have made for themselves guidelines for testing legislation against the clause.

Pennsylvania, in *Malone v. Hayden*, 329 Pa. 213, 197 A. 344 (1938), said courts can only decide whether legislation has a reasonable relation to the thorough and efficient mandate and whether the "fruits or effects" impinge the article by circumscribing it.

Illinois, in *People ex rel. Russell v. Graham*, 301 Ill. 446, 134 N.E. 57 (1922), said courts cannot interfere unless the legislature creates a system "which all reasonable men must agree is not an efficient and thorough system, as those terms are commonly and generally understood." *Id.* at 452, 134 N.E. at 60. Yet, in *Fiedler v. Eckfeldt*, 335 Ill. 11, 166 N.E. 504 (1929), mention is made that Illinois courts will enforce free schools, open to all equally.

Kentucky has said it will only question appropriateness of legislation to provide an efficient system of common schools statewide, if the legislation contravenes some other constitutional provision of equal dignity. *Board of Education of Louisville v. Board of Education of Jefferson County*, 458 S.W.2d 6 (Ky. 1970).

monwealth, *supra; Revell v. Annapolis, supra; Associated Schools of Independent Dist. No. 63 v. School Dist. No. 83, supra; McNair v. School District No. 1,* 87 Mont. 423, 288 P. 188 (1930); *Society for Establishing Useful Manufactures v. City of Paterson,* 89 N.J.L. 208, 98 A. 440 (1916); *Miller v. Korns, supra; Malone v. Hayden, supra; Flory v. Smith,* 145 Va. 164, 134 S.E. 360 (1926).

[23] *Kuhn v. Board of Education of Wellsburg, supra; Dickinson v. Edmondson, supra; In re Kindergarten Schools, supra; In re School Code of 1919, supra; Fenton v. Bd. of Com'rs of Ada County, supra; People ex rel. Russell v. Graham, supra; Commonwealth ex rel. Meredith v. Norfleet,* 272 Ky. 800, 115 S.W.2d 353 (1938); *Revell v. Annapolis, supra; Board of Education of City of Minneapolis v. Houghton,* 181 Minn. 576, 233 N.W. 834 (1930); *Evers v. Hudson, supra; Robinson v. Cahill,* 118 N.J. Super. 223, 287 A.2d 187 (1972); *State ex rel. King v. Sherman,* 104 Ohio St. 317, 135 N.E. 625 (1922); *Malone v. Hayden, supra; Houston v. Gonzales Independent School Dist.,* Tex. Civ. App., 202 S.W. 963 (1918); *Flory v. Smith, supra.*

Virginia, in *Flory v. Smith*, 145 Va. 164, 168, 134 S.E. 360, 362 (1926), limited review to "the reasonableness of the regulation promulgated. To hold otherwise would be to substitute judicial opinion for the legislative will."

Texas holds: "The Legislature alone is to judge what means are necessary and appropriate ... [Its] determination ... is final, except when so arbitrary as to be violative of the constitutional rights of the citizen." *Mumme v. Marrs*, 120 Tex. 383, 396, 40 S.W.2d 31, 36 (1931). And we have said that the legislature is "to judge of the thoroughness and efficiency." *Kuhn v. Board of Education of Wellsburg*, 4 W.Va. 499, 509 (1871).

But these jurisdictions have not hesitated to examine legislative performance of the mandate, and we think properly so, even as they recite that courts are not concerned with the wisdom or policy of the legislation. *State ex rel. Methodist Children's Home Association v. Board of Education of Worthington Village School District of Franklin County*, 105 Ohio St. 438, 138 N.E. 865 (1922).

Many courts have recognized the legislative duty to provide necessary funds or power to raise funds to whatever bodies they have delegated education responsibility.[24] And we are particularly aware of the admonition in 1871 in *Kuhn v. Board of Education of Wellsburg, supra*:

> "From this clause it is plain, the people intended that the 'thoroughness' and 'efficiency' of the system of free schools, adopted by the legislature, should in no wise be prejudiced by the want

---

[24] *State ex rel. Brotherton v. Blankenship*, ___ W. Va. ___, 207 S.E.2d 421 (1973); *Brennan v. Black*, 34 Del. Ch. 380, 104 A.2d 777 (1954); *Fenton v. Bd. of Com'rs of Ada County, supra; McIntire v. Powell*, 137 Ky. 477, 125 S.W. 1087 (1910); *State ex rel. Board of Education of City of Minneapolis v. Erickson*, 190 Minn. 216, 251 N.W. 519 (1933); *State ex rel. Lien v. School District No. 73*, 106 Mont. 223, 76 P.2d 330 (1938); *Board of Education of Elizabeth v. City Council*, 55 N.J. 501, 262 A.2d 881 (1970); *Miller v. Korns, supra; Richardson v. Liberty Independent School Dist.*, Texas Civ. App., 22 S.W.2d 475 (1929).

> of ample means. They make it obligatory upon the legislature to provide for the support of such schools ... thus placing in the hands of the legislature, for that purpose, plenary, if not absolute, power." [4 W.Va. 499 at 509]

But equality of funding has not been required in the majority of states with mandated thorough and efficient school systems. *McInnis v. Shapiro*, 293 F. Supp. 327 (N.D. Ill. 1968), *aff'd sub nom. McInnis v. Ogelvie*, 394 U.S. 322 (1969); *Thompson v. Engelking*, 96 Idaho 793, 537 P.2d 635 (1975); and *Danson v. Casey*, 33 Pa. Cmwlth. 614, 382 A.2d 1238 (1978), strike down attacks based on equal protection or due process, upon school financing inequalities. *City of Louisville v. Commonwealth*, 134 Ky. 488, 121 S.W. 411 (1909).

Courts have often declared that legislatures have plenary authority to determine the bounds of thorough, efficient education. This has been the common way for approving acts deemed to have been intended to improve education systems, when attacked as violating some other constitutional right.[25]

---

[25] Our Court is one of the few we have found that on every occasion has not given extra weight to the education mandate, balanced against other constitutional rules. We have held that a constitutional prohibition against the State extending credit to local governments applied also to State payment of local school districts' bonds. *Berry v. Fox*, 114 W.Va. 513, 172 S.E. 896 (1934). The decision, by a divided court, was unfortunate. No authority about payment by the state of local school debts was cited. Instead, the majority wrote: "The school houses, also, whether paid for from the proceeds of bonds or not, remain permanently for the use of the communities which brought them into being." [*Id.* at 524, 172 S.E. at 901] Apparently the court was not apprised that local district debts were state responsibilities because the districts themselves were agencies of the State, and doing the State's work when they incurred the debts. This case is now moot; but we disapprove and overrule it to the extent that it diminishes State responsibility for public schools. *Compare Revell v. Annapolis*, 81 Md. 1 (1895).

We have also written that the education mandate "stands no higher than the mandate" in Article VI, Section 51, which prescribes how State appropriation may be made (this article has since been amended). We affirmed that the procedure by which educational proceeds were to be appropriated was constitutionally con-

Many decisions we have reviewed reflect affirmation of judicial deference to legislative plenary power over education, and then judicially approve legislation as being within that power.

We need not reflect upon the conundrum presented by these several cases—that the judiciary, bowing to legislative branches' plenariness, hardly ever has refused to speak its approval or disapproval of the legislatures' plenary acts.

However, courts have not stopped there. Nearly every one has intervened when an act by a legislature or a proceeding by a local school board, as agent of the legislature, is offensive to judicial notions about what a thorough and efficient education system is.

Illinois is a prime example. The court there has repeatedly deferred to legislative wisdom in matters educational. And yet, it has chosen to disapprove local school district boundary changes specifically ratified by legislation, because the resulting boundaries were not, in the court's opinion, consistent with the "efficient" school system constitutionally required. *People v. Deatherage*, 401 Ill. 25, 81 N.E.2d 581 (1948).

New Jersey courts have, of course, in *Robinson v. Cahill* cases, applied their judgment to legislative acts considered to have fallen short of establishing a thorough and efficient school system.

The Colorado court has judged that legislatures have inherent power to provide for education, and that the legislature can establish kindergartens even though the constitutionally mandated age for commencement of schooling is six. *In re Kindergarten Schools*, 18 Colo. 234 (1893).

Montana's court has compelled a local school board to provide education to the only two children in a school

---

trolled and a requisition based upon an unconstitutional appropriation bill was not cured by the thorough and efficient mandate. *State ex rel. Trent v. Sims*, 138 W.Va. 244, 77 S.E.2d 122 (1953).

district, *State ex rel. Lien v. School District No. 73*, 106 Mont. 223, 76 P.2d 330 (1938), and enjoined collection of fees for books and materials used in its public schools, *Granger v. Cascade County School District No. 1*, 159 Mont. 516, 499 P.2d 780 (1972).

The Kentucky high court required a board of education to act constitutionally after finding that closing a particular school caused the school system to be inefficient. *Wooley v. Spalding*, 293 S.W.2d 563 (Ky. 1956).

In Virginia, a statute permitting local elections about whether school boards' real property was needed for public purposes was held to be unconstitutional because it interfered with school boards' constitutional functions. *Howard v. County School Board of Allegheny County*, 203 Va. 55, 122 S.E.2d 891 (1961).

Our Court has required free textbooks, and has required inclusion of "state aid to education" in the budget. *Vandevender v. Cassall*, ____ W.Va. ____, 208 S.E.2d 436 (1974); *State ex rel. Brotherton v. Blankenship*, ____ W.Va. ____, 207 S.E.2d 421 (1973).

Two cases represent differences in approach to school finance attacks in thorough and efficient states, and different results. In *Danson v. Casey, supra*, the Commonwealth Court of Pennsylvania dismissed a challenge to certain statutes that provided state subsidies to public schools. The court specifically found that the statutory scheme, which applied a uniform subsidy formula statewide while at the same time adapting to differences in communities by providing for local taxation, was not discriminatory.

> "The current system is yet another step in continuing legislative attention to correlate State aid formulae with local districts' needs and fiscal capacity.... The goal is to equalize educational opportunity and remove that opportunity from dependence upon the student's situs or status. Whether the proper nexus has been maintained between the elements of the subsidy formula and

the professed goal has been a source of criticism.
. . .

. . . .

"It has been held that '[i]n considering laws
relating to the public school system, courts will
not inquire into the reason, wisdom, or expedien-
cy of the legislative policy with regard to educa-
tion, but whether the legislation has a reason-
able relation to [a thorough and efficient system
of public schools]. *Teachers' Tenure Act Cases,
supra,* 329 Pa. at 224, 197 A. at 352.

. . . .

"Although all educational financing cases are
sui generis in the sense that the alleged depriva-
tion is relative rather than absolute, we find no
discrimination, invidious or otherwise, in a sys-
tem that applies a uniform subsidy formula
statewide, while at the same time adapting to
community diversification by providing for local
taxation. To the extent that it aids the promo-
tion of a public school system, the subsidy formu-
la is fair. To the extent that it provides no less
than it makes available to other school districts,
it is substantial. Given the varying interdistrict
educational costs, and the uncertain nexus be-
tween the cost and quality of education, we can-
not say, as a matter of law, that Pennsylvania's
subsidy formula is not fairly and substantially
related to ensuring a thorough and efficient sys-
tem of public education." [Footnotes omitted]
[382 A.2d at 1242-1245]

The opinion then interpreted the "thorough and effi-
cient" standard:

"Although we subscribe to the view that Arti-
cle III, of Section 14, does impose a duty upon
the legislature to provide equal educational op-
portunity to the Commonwealth's school chil-
dren, and that this duty exists separate and
apart from the proscription against special laws
contained within Article III, Section 32, *we see
no reason to apply a test under this section any*

*different from the fair and substantial relation test applied in our equal protection analysis. We do not interpret the mandate* to 'provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth' *as to require absolute equality in educational services or expenditures, but rather equality in the relative sense of adapting to local conditions.* Challenges predicated upon similar constitutional provisions have succeeded in other jurisdictions by virtue of the reliance placed in those jurisdictions upon local real property tax base in determining either the permissible level of local taxation or the limits of state subsidies, and the manner in which such reliance discriminates against poorer districts. *See Serrano v. Priest,* 5 Cal.3d 584, 96 Cal. Rptr. 601, 487 P.2d 1241 (1971); *see also Horton v. Meskill, supra* note 15. We find no such undue reliance in Pennsylvania's equalization grant formula." [Emphasis supplied] [382 A.2d at 1246]

The court then sustained a demurrer to the petition for relief.

Dissenting judges would have found a cause of action stated, and further, "[S]urely this Court could strike down a system of laws which unconstitutionally deprives school children of equal educational advantages and of the thorough and efficient education promised by the State Constitution. . . ." [382 A.2d at 1247]

After the Superior Court of New Jersey, in *Robinson v. Cahill,* 118 N.J. Super. 223, 287 A.2d 187 (1972), concluded that education must be raised to a "thorough" level in all districts of the state where deficiencies existed and that the school financing system with equalizing factors was not overcoming inequities in the distribution of school funds and tax burdens, New Jersey's Supreme Court, in a persuasive opinion reported in 62 N.J. 473, 303 A.2d 273 (1973),[26] held that the school financing

---

[26] Discussions of *Robinson v. Cahill* are in: Martell, *School Finance Reform: Robinson v. Cahill,* 13 Urban L. Ann. 139 (1977); Tractenberg, *Reforming School Finance Through State Constitu-*

scheme did not violate either the federal or state equal protection clauses, but that it did not permit quality education required by the thorough and efficient mandate in the New Jersey Constitution:

> "In the light of the foregoing, it cannot be said the 1875 amendments were intended to insure statewide equality among taxpayers. *But we do not doubt that an equal educational opportunity for children was precisely in mind.* The mandate that there be maintained and supported 'a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years' can have no other import. Whether the State acts directly or imposes the role upon local government, the end product must be what the Constitution commands. *A system of instruction in any district of the State which is not thorough and efficient falls short of the constitutional command.* Whatever the reason for the violation, the obligation is the State's to rectify it. If local government fails, the State government must compel it to act, and if the local government cannot carry the burden, the State must itself meet its continuing obligation....
>
> ....
>
> "The trial court found the constitutional demand had not been met and did so on the basis of discrepancies in dollar input per pupil. We agree. We deal with the problem in those terms because dollar input is plainly relevant and because we have been shown no other viable criterion for measuring compliance with the constitutional mandate. The constitutional mandate could not be said to be satisfied unless we were

---

*tions: Robinson v. Cahill Points the Way,* 27 Rutgers L. Rev. 365 (1974); Note, *Robinson v. Cahill: A Case Study in Judicial Self-Legitimization,* 8 Rut. Cam. L.J. 608 (1977); Ruvoldt, *Educational Financing in New Jersey: Robinson v. Cahill and Beyond,* 5 Seton Hall L. Rev. 1 (1973); Berke & Sinkin, *Developing a "Thorough and Efficient" School Finance System: Alternatives for Implementing Robinson v. Cahill,* 3 J.L. & Educ. 337 (1974).

to suppose the unlikely proposition that the lowest level of dollar performance happens to coincide with the constitutional mandate and that all efforts beyond the lowest level are attributable to local decisions to do more than the State was obliged to do." [Emphasis supplied] [303 A.2d at 294, 295]

The *Robinson* case returned to the New Jersey Supreme Court many times for implementation. Finally, in *Robinson v. Cahill*, 69 N.J. 449, 355 A.2d 129 (1976), which tested new school financing legislation, the court said it was constitutional assuming it would be fully funded. The new act defined a "thorough and efficient" system of public schools, and listed certain elements of such a system.[27] Power was given the state commission-

---

[27] The court said about the new act:

"In *Robinson I* we pointed out that the State had never defined or spelled out the content of the educational opportunity required by the Constitution, and we indicated that this must be done so that 'in some discernible way' the scope of this obligation would be made apparent. 62 N.J. at 516, 519, 303 A.2d 273. This, as we have noted, the Legislature has now undertaken to do. The goal of a thorough and efficient education and the principal elements of which it must consist are explicitly stated:

"The goal of a thorough and efficient system of free public schools shall be to provide to all children in New Jersey, regardless of socioeconomic status or geographic location, the educational opportunity which will prepare them to function politically, economically and socially in a democratic society. [N.J.S.A. 18A: 7A-4]

"A thorough and efficient system of free public schools shall include the following major elements, which shall serve as guidelines for the achievement of the legislative goal and the implementation of this act:

"a. Establishment of educational goals at both the State and local levels;

"b. Encouragement of public involvement in the establishment of educational goals;

"c. Instruction intended to produce the attainment of reasonable levels of proficiency in the basic communications and computational skills;

"d. A breadth of program offerings designed to develop the individual talents and abilities of pupils;

"e. Programs and supportive services for all pupils especially those who are educationally disadvantaged or who have special educational needs;

er to determine that a "thorough and efficient" system of public education existed. The court retained jurisdiction to determine whether the new act was being funded.

So, on the threshold question: no court has been hesistant to affirm legislation; many have required specific actions by local boards to bring them to compliance with the constitutional mandate; and legislation has been declared unconstitutional because it failed the mandate. There is therefore ample authority that courts will enforce constitutionally mandated education quality standards.

Next we must define terms that are basic to the case: "thorough;" "efficient;" "education."

There are four traditional methods of judicial definitions of words used in statutes and constitutions and not specifically defined in them: dictionary definitions current at the time, and those now extant; pronouncements by courts; reliable extra-judicial commentary; and definitions set or inferrable from debates and proceedings of the bodies that drew the documents.

*A Complete and Universal English Dictionary*, by Rev. James Barclay, London, Richard Edwards, 1815, defines "thorough": "[T]he word thorough extended into two syllables ... complete; passing in at one side, and beyond the other...."

It defines "efficient": "[A] cause; one that makes or causes things to be what they are ... having the power to produce or cause alteration or change in things, either by altering the qualities, or in introducing new ones...." [at 326]

---

"f. Adequately equipped, sanitary and secure physical facilities and adequate materials and supplies;

"g. Qualified instructional and other personnel;

"h. Efficient administrative procedures;

"i. An adequate State program of research and development; and

"j. Evaluation and monitoring programs at both the State and local levels. [N.J.S.A. 18A:7A-5] [69 N.J. at 456-57, 355 A.2d at 132, 133]

*Webster's Third New International Dictionary*, Unabridged, G. & C. Merriam Company, Springfield, Mass., 1976, definitions are:

"Thorough ... marked by completeness; ... carried through to completion especially with full attention to details; ... marked by sound systematic attention to all aspects and details; ... complete in all respects...."

"Efficient ... marked by ability to choose and use the most effective and least wasteful means of doing a task or accomplishing a purpose: competent ... marked by qualities, characteristics, or equipment that facilitate the serving of a purpose or the performance of a task in the best possible manner; eminently satisfactory in use ..."

Lexically, then, the words have not changed. The mandate, incorporating the sense of the definitions, becomes a command that the education system be absolutely complete, attentive to every detail, extending beyond ordinary parameters. And further, it must produce results without waste.

There is a paucity of definitions by courts of "thorough" and "efficient," and most are circumbendibus, defining by rulings that such-and-such acts or proceedings further or fail to further thorough or efficient school systems, or identify objectives the words were intended to obtain and thus allow oblique definitions.

Ohio's *Miller v. Korns*, 107 Ohio St. 287, 298, 140 N.E. 773, 776 (1923), attempted forthright definitions: "An efficient system could not mean one in which part or any number of the school districts of the state lacked teachers, buildings or equipment." *Board of Education of East Brunswick v. Township Council of East Brunswick*, 91 N.J. Super. 20, 218 A.2d 896 (1966), added proper school buildings, equipment and courses of study, and *Board of Education of Elizabeth v. City Council of Elizabeth*, 55 N.J. 501, 262 A.2d 881, 883 (1970), affirmed the propriety

of legislative delegation of overall "supervisory and central authority" in the state board of education and state commissioner to act for it.

*Associated Schools of Independent District No. 63 v. School Dist. No. 83*, 122 Minn. 254, 142 N.W. 325, 327 (1913), quoting *Board of Education of Sauk Centre v. Moore*, 17 Minn. 412, puts the constitutional objective: "[T]o insure a regular method throughout the state, whereby all may be enabled to acquire an education which will fit them to discharge intelligently their duties as citizens of the republic."

"Efficient' has reference not only to the qualifications of the teacher, but relates to other basic matters associated with the school system." *Ehret v. School District of Kulpmont*, 333 Pa. 518, 525, 5 A.2d 188, 192 (1939).

An equality factor in the concepts of thorough and efficient was recognized in *Danson v. Casey*, Pa. Cmwlth., 382 A.2d at 1243: "The goal is to equalize educational opportunity and remove that opportunity from dependence upon the student's situs or status. . . ." but in a relative way, adapting to local conditions (whatever that may mean).

*Robinson v. Cahill*, 118 N.J. Super. 223, 268, 287 A.2d 187, 210–211, defines by identifying what a thorough and efficient education system must do: "[Afford] to every child such instruction as is necessary to fit it for the ordinary duties of citizenship. . . . The word 'thorough' in the Education Clause connotes in common meaning the concept of completeness and attention to detail. It means more than simply adequate or minimal."

Illinois has much more restrained definitions, that thorough and efficient schools are open to everyone, and local districts must be compact. *People ex rel. Community Unit School District No. 5 v. Decatur School District No. 61*, 31 Ill.2d 612, 203 N.E.2d 423 (1965). And in Illinois, efficient schools are strike-free. *Board of Education of Community Unit School District No. 2 v. Redding*, 32 Ill.2d 567, 207 N.E.2d 427 (1965).

Colorado adopted the Wisconsin court's words: "[C]hildren ... are the wards of the state, to the extent of providing for their education to that degree that they can care for themselves and act the part of intelligent citizens." *Fangman v. Moyers*, 90 Colo. 308, 312, 8 P.2d 762, 764 (1932).

Idaho excludes from educational thoroughness any element of equal per pupil expenditures, in *Thompson v. Engelking*, 96 Idaho 793, 537 P.2d 635 (1975).

In *McNair v. School District No. 1*, 87 Mont. 423, 288 P. 188 (1930), the Montana court actually asks: "What, then, constitutes a 'thorough' system of education in our public schools?" The answer is unspecific: it is a system that trains both mind, morals and body, and furthers "happiness, efficiency and capacity for social services of the educated. *Webster's New International Dictionary*." [*Id.* at 428, 288 P. at 190] Also, access to adequate facilities and materials are ingredients of thoroughness, per *Grant v. Michaels*, 94 Mont. 452, 23 P.2d 266 (1933).

Arkansas has judicially decreed that "[A]n efficient system of free schools ... can best be done by and through the [local] boards of education." *Manley v. Moon*, 177 Ark. 260, 264, 6 S.W.2d 281, 283 (1928); efficiency was promoted by regulation of sororities and fraternities, *Isgrig v. Srygley*, 210 Ark. 580, 197 S.W.2d 39 (1946); and efficiency was promoted by allowing its governor to close schools that in his opinion became inefficient when integrated. *Garrett v. Faubus*, 230 Ark. 445, 323 S.W.2d 877 (1959).

Creating local school boards for local school districts, building schools, providing free textbooks, and authorizing supporting taxation, were "[m]achinery for an efficient system of public free schools ..." in *City of Dallas v. Love*, Texas Civ. App., 23 S.W.2d 431, 433 (1930). Also, building a home for teachers might promote efficiency, *Adams v. Miles*, Texas Civ. App., 35 S.W.2d 123 (1931), as would sale of food and school supplies, *Bozeman v. Morrow*, Texas Civ. App., 34 S.W.2d 654 (1931), and regulation of student organizations, *Wilson v. Abilene In-*

*dependent School District*, Texas Civ. App., 190 S.W.2d 406 (1945).

In Kentucky, a local board that starved, then closed a high school serving an identifiable part of its constituency, violated the constitutional efficiency mandate. *Wooley v. Spalding, supra.*

In Delaware, efficient schools must be supervised by school authorities, *Corder v. City of Milford*, Del. Super. Ct., 196 A.2d 406 (1963), and local school governance promotes efficiency, *Morris v. Board of Education of Laurel Sch. Dist.*, 401 F. Supp. 188 (D. Del. 1975).

Virginia approves local administration as promoting efficiency, *Flory v. Smith, supra*, and the local school authorities should control school expenditures, *Board of Supervisors of Chesterfield County v. County School Board of Chesterfield County*, 182 Va. 266, 28 S.E.2d 698 (1944). *Harrison v. Day*, 200 Va. 439, 451, 106 S.E.2d 636, 646 (1959), defined efficient in a segregation case: "[I]t is clear that the word . . . embraces . . . a sufficient number of schools with adequate buildings and equipment, a sufficient number of competent teachers, and other basic matters associated with the public school system. . . . [T]he separation of the races alone will not . . . constitute an 'efficient system.' "

We have found efficiency served when the legislature has established "special high schools, and graded schools in any locality where it may think it wise to do so. . . ." *Herold v. McQueen*, 71 W. Va. 43, 49, 75 S.E. 313, 316 (1912), and have decided that in an efficient school system, free textbooks are necessarily made available to indigents. *Vandevender v. Cassell, supra.*

Constitutional conventioners generally spoke of goals intended by the words they used. Ohio's Archbold's statement that he "wanted to see a system of schools as perfect as could be devised, and to see it improve so as to keep pace with the most rapid progress of the most rapid element of our social or political constitution," de-

scribes what a thorough and efficient system should attain.

A Texan argued against one, two or three-month school terms because they would be inefficient.

West Virginians in the 1861-63 and 1872 Conventions did not expressly define the words they used. Perhaps telling evidence of their intention to mandate a thorough and efficient system of the highest quality educators could devise, was the defeat, at the 1872 Convention, of inclusion of "common" as a word descriptive of the schools they intended to be established. In both conventions, the ideals hoped to be obtained were manifested, however.

The debates and cases often mention that ingredients of a thorough and efficient education system are changeable, and most adapt to conditions its beneficiaries need meet. *Malone v. Hayden, supra,* and Archbold's statement in the Ohio Convention are examples.

Dr. Ambler's commentaries that wealthy schools situate among poor schools did not make a thorough and efficient system are important because they were made about conditions long before there was any thought of judicial challenge to the system. [See Appendix II at 59] Compare the trial court's finding that some West Virginia counties have thorough school systems, and therefore the entire State system is constitutional.

"Education" is the remaining word to be defined. *The Random House Dictionary,* Unabridged Edition (1973), rather concisely defines the word: "1. [T]he act or process of imparting or acquiring general knowledge, developing the powers of reasoning and judgment, and generally of preparing oneself or others intellectually for mature life. 2. [T]he act or process of imparting or acquiring particular knowledge or skills, as for a trade or profession. . . ."

According to *Kaplan v. School District of Philadelphia,* 178 Pa. Super. 88, 113 A.2d 164 (1955), and *McNair v. School District No. 1, supra,* it includes cultivation of

intellectual culture. We and others include body development, *e.g., Wysong v. Walden*, 120 W. Va. 122, 196 S.E. 573 (1938).

*McNair, supra,* quotes *Webster*: "To educate is to 'lead forth, bring up * * * to develop physically,' and education is 'the totality of the qualities acquired through individual instruction and social training, which further happiness, efficiency and capacity for social service of the educated.' " [87 Mont. at 428, 288 P. at 190]

Arkansas has said education is to prepare one for a useful vocation in life. *Dickinson v. Edmondson*, 120 Ark. 80, 178 S.W. 930 (1915).

We may synthesize a definition of education from the cases, encyclopedias (28 C.J.S. *Education*, for example), and dictionaries: It is the development of mind, body and social morality (ethics) to prepare persons for useful and happy occupations, recreation and citizenship.[28]

We may now define a thorough and efficient system of schools: It develops, as best the state of education expertise allows, the minds, bodies and social morality of its charges to prepare them for useful and happy occupations, recreation and citizenship, and does so economically.

Legally recognized elements in this definition are development in every child to his or her capacity of (1) literacy; (2) ability to add, subtract, multiply and divide numbers; (3) knowledge of government to the extent that the child will be equipped as a citizen to make informed choices among persons and issues that affect his own governance; (4) self-knowledge and knowledge of his or her total environment to allow the child to intelligently choose life work—to know his or her options; (5)

---

[28] *Compare* the New Jersey legislature's goals of a thorough and efficient school system, n. 27 *supra* at 28–29, and also, the elements of a thorough and efficient system as envisioned in New Jersey which, while formulated by that state's legislature, were accepted by the courts, conditioned upon "sufficient fiscal support." *Robinson v. Cahill*, 69 N.J. 449 at 457, 355 A.2d 129 at 132-33.

work-training and advanced academic training as the child may intelligently choose; (6) recreational pursuits; (7) interests in all creative arts, such as music, theatre, literature, and the visual arts; (8) social ethics, both behavioral and abstract, to facilitate compatability with others in this society.

Implicit are supportive services: (1) good physical facilities, instructional materials and personnel; (2) careful state and local supervision to prevent waste and to monitor pupil, teacher and administrative competency.

We recognize that many facets of public education are being examined by educators, economists, sociologists and other critics.[29] However, there are undeniable legal

---

[29] For excellent examples, see Levine & Bane, The "Equality" Controversy, Basic Books, Inc., 1975. See also a statement by Richard Neely (now my Brother on this Bench), "Testimony on Economic Development and Education," Nation's Manpower Revolution: Hearings Before the U. S. Senate Subcommittee on Employment and Manpower, Vol. VI, p. 1026 et seq. (1963):

"Today this country is experiencing a proliferation of high school dropouts coming mainly from the underprivileged ... In order to encourage students from an underprivileged background to stay in school and be attentive while they are there, the schools must be made ... more attractive. ... If school administrators in all parts of the country were aware of the methods which can be used to raise children's and parent's aspirations, the schools would be in a better position to prepare children for entry into the modern labor market. As long as there is a gap between what parents believe their children's opportunities to be and what the economy dictates their opportunities shall be, the parents will act as a retarding influence on their children's progress. To raise aspirations work must be done with both parents and children."

As if in answer, during an interview on September 4, 1978, by Jerry Sander, televised on WSAZ-TV, Huntington/Charleston, West Virginia, James McCann, Superintendent of Schools of Lincoln County, remarked:

"Parents need to become more involved in school and need to be more concerned about the education of their children—not just be contented that they finished grade school or finished high school, but just want more education in general for their kids—better quality education, and I am here you know, to work with them and encourage that and I feel that somewhere down through time that that is one of the things—a lack of interest and concern on the part of the parents. ..."

bases for all our conclusions, including the elements specifically distilled from the debates and cases that are the specifications of what a thorough and efficient school system should have, and should do.

*Constitutional Issues Conclusion*

We conceive that both equal protection and thorough and efficient constitutional principles can be applied harmoniously to the State school financing system. Certainly, the mandatory requirement of "a thorough and efficient system of free schools," found in Article XII, Section 1 of our Constitution, demonstrates that education is a fundamental constitutional right in this State.

Because education is a fundamental constitutional right in this State, then, under our equal protection guarantees any discriminatory classification found in the educational financing system cannot stand unless the State can demonstrate some compelling State interest to justify the unequal classification. *State ex rel. Piccirillo v. City of Follansbee*, ___ W.Va. ___, 233 S.E.2d 419 (1977); *Cimino v. Board of Education of County of Marion*, ___ W.Va. ___, 210 S.E.2d 485 (1974).

Here, the trial court was asked to decide whether the State financing system was so deficient that in certain counties, such as Lincoln, it failed to provide a thorough and efficient system of education. On the record before us, we choose to make no definitive judgment on this point. The trial court was unable to make any judgment either, because it lacked any suitable standards to set the core values of a thorough and efficient educational system.

However, given the legally recognized components of thorough and efficient school systems, it is obvious from the circuit court's findings about Lincoln County schools that they are, to say the least, woefully inadequate by those standards, and we would frankly be surprised if

---

Appendix V is a compilation of extra-judicial materials consulted during preparation of the opinion but not cited, and Appendix VI is a compilation of cases considered but not cited.

the school system will meet any thorough and efficient standard that may be developed on the remand.

Of course, when we talk of setting standards for a thorough and efficient education system, we recognize that expert testimony will be needed. Mere rote comparison with other more affluent counties does not necessarily serve to define the values of such a system.

And we emphasize that great weight will be given to legislatively established standards, because the people have reposed in that department of government "plenary, if not absolute" authority and responsibility for the school system.

In summary of the guiding legal principles which must shape the general contours of this case, we find under our State's Equal Protection Clause that because education is a constitutionally derived right in this State, the more demanding strict scrutiny equal protection standard is thrust upon the State.

We also have determined that the Thorough and Efficient Clause requires the development of certain high quality educational standards, and that it is in part by these quality standards that the existing educational system must be tested. Directly related to this is the further finding that if these values are not currently being met, it must be ascertained that this failure is not a result of inefficiency and failure to follow existing school statutes.

With these broad principles in mind, we proceed to a further analysis of the current State education statutes to develop specific lines of inquiry on remand.[30]

### DEVELOPMENT ON REMAND
*The Financing System*

Our State school aid formula is composed of four basic components: (1) an amount raised from local levy on real

---

[30] See the excellent student note by Gillenwater & Gorrell, *Constitutional Law—Taxation—Equal Education: A Public School Financing Proposal for West Virginia*, 75 W.Va. L. Rev. 50 (1972).

and personal property;[31] (2) the State foundation aid, which is money the State pays out of general revenue funds to the counties based on a formula composed of seven components;[32] (3) State supplemental benefits; and (4) amounts raised locally by special levies by vote of the people in the county.[33]

We note initially that no challenge is made to that part of financing for schools that arises from local levies. This issue was raised unsuccessfully in other school financing cases. *Robinson v. Cahill, supra; Serrano v. Priest, I & II, supra; Horton v. Meskill, supra.* Article XII, Section 5 of our Constitution expressly states that local taxation on property for school purposes is permitted to the extent that the Legislature may provide by general law:

> "The legislature shall provide for the support of free schools by appropriating thereto the interest of the invested 'school fund,' the net proceeds of all forfeitures and fines accruing to this State under the laws thereof and by general taxation of persons and property or otherwise. It shall also provide for raising in each county or district, by the authority of the people thereof, such a proportion of the amount required for the support of free schools therein as shall be prescribed by general laws."[34]

---

[31] W.Va. Code, 18-9A-2.

[32] W.Va. Code, 18-9A-3 through 12.

[33] Under the West Virginia Constitution, Article X, Section 1, maximum levy rates are set for each class of property, but by a 60 percent vote of the people an express levy may be made, but his too is limited to 50 percent of the maximum regular levy rates.

[34] Further acknowledgment of local levies on property is found in Article XII, Section 7 of the West Virginia Constitution:

"All levies that may be laid by any county or district for the purpose of free schools shall be reported to the clerk of the county court, and shall, under such regulations as may be prescribed by law, be collected by the sheriff, or other collector, who shall make annual settlement with the county court; which settlements shall be made a matter of record by the clerk thereof, in a book to be kept for that purpose."

We do not consider, at least facially, that the State's foundation aid statute violates concepts of equal protection, because the gross foundation aid has subtracted from it amounts raised by the county from the regular local property levy.[35] Thus, a county which generates a small amount from the local property tax receives a larger amount of State foundation aid than does a county with a large local property tax. This is graphically demonstrated by Exhibit B to plaintiffs' brief. [Attached as Appendix IV] The amounts raised from the local property tax by general levy are shown in the first segment on the bar graph. The State foundation aid is the second segment of the graph.

It is argued on appeal, however, that there are basic inequities in the seven-factor computation by which the foundation aid is computed.[36] These factual contentions

---

[35] *See* W.Va. Code, 18-9A-12. There may be some problem if, on remand, it is determined that Lincoln County is not utilizing the State Tax Commissioner's appraisement figures and the county court has not allocated to the county board of education, under W.Va. Code, 18-9A-11, the differential between the revenues that it would have received based on the Tax Commissioner's appraisal and the amount actually received on the lower appraisal. W.Va. Code, 18-9A-11, requires the State Board of Education to compute the county's property tax revenues for school purposes based on appraisement made by the State Tax Commissioner. It is this amount which is subtracted from the county's gross State foundation aid. Obviously, if the counties are not following the State Tax Commissioner's appraisal figures and the county court is not supplementing the difference, disparities arise between the actual tax revenues received for school purposes and the hypothetical figure used in the State foundation aid formula. We discuss the appraisal problem at some length in a subsequent portion of the opinion.

[36] Appellants in their Brief at p. 22 state:

"The major factors causing these disparities are as follows. First, the hypothetical 'local share', which is *deducted* from the seven-factor computation of expenses used in determining state foundation aid is 17 percent *less* than the amount actually raised locally for education. This 17 percent is thus not considered in the state aid calculation. Second, the primary expense category for the state aid formula is the 'allowance for professional educators,' which category also determines to a large extent the expense allowances in categories 2, 3, 5 and 6. In property-poor counties the number of

were not developed below and should be explored before the trial court can determine if the State foundation aid meets equal protection standards.

*Supplemental State Aid*

From the record we are unable to make any determination about this part of the State financing formula. It was not discussed by the trial court nor the parties. That it exists is manifested by Exhibit B to the Appellant's Brief. We are not advised of its source or how it flows to the counties. This is obviously a critical area for development below. If supplemental aid can be made available to those counties whose educational systems are below the standards of a thorough and efficient system and this raises them to the standards, which seems unlikely considering the sorry conditions in Lincoln County schools, then the claim of unconstitutionality under the Thorough and Efficient Clause may be dissipated.

*Tax Revenues from Special or Excess Levy on Property*

While it is not clear from the record what role the trial court assigned to revenues generated from excess levies voted by citizens in a given county, we believe these revenues are not subject to attack under our Equal Protection Clause.

The United States Supreme Court has specifically upheld the 60 percent majority vote requirement contained in Article X, Section 1 of our Constitution, as against an equal protection attack on the right to set such requirement in *Gordon v. Lance*, 403 U.S. 1, 29 L. Ed. 2d 273, 91 S.Ct. 1889 (1971), *rev'g* 153 W.Va. 559, 170 S.E.2d 783 (1969). Consequently, the voluntary exercise of such right does not violate equal protection standards of either our State or Federal Constitutions. The reason is that the excess taxes arise by the free will of the citi-

professional educators is less proportionately than in property-rich counties because of lack of classroom facilities and other physical resources. . . ."

zens in the counties, who must, by a 60 percent vote, agree to impose this excess tax on themselves.

The violation of the equal protection standard usually arises from state action; that is, the act of a legislative body in setting, by some statute or ordinance, an arbitrary classification. *Woodring v. Whyte*, ____ W.Va. ____, 242 S.E.2d 238 (1978); *O'Neil v. City of Parkersburg*, ____ W.Va. ____, 237 S.E. 2d 504 (1977); *State ex rel. City of Charleston v. Coghill*, ____ W.Va. ____, 207 S.E.2d 113 (1973); *Chesapeake & Potomac Telephone Co. v. City of Morgantown*, 143 W.Va. 800, 105 S.E.2d 260 (1958). Here, these excess levies are determined by the vote of the people.[37]

The exemption of excess levy funds from equal protection standards may not prevent them from being counted as available for the thorough and efficient standard.

But certainly there are limits to the amount of reliance that can be placed on this source of funds, considering the State government's constitutional responsibility to assure a thorough and efficient system of schools.

### The Property Appraisement System

The trial court acknowledges that one source of disparity between the amounts raised through property taxes in the various counties is that some are poor in property wealth. There is no evidentiary development of this issue, and it should be examined to develop whether the "poor" counties are assessing their properties adequately, and whether, per W. Va. Code, 18-9A-11, the State Tax Commissioner reappraises all real property in the counties and to make certain that local assessors are using the Tax Commissioner's values.[38] This same stat-

---

[37] Courts, as well as educators, have recognized that in any well-devised educational system there should be some local initiative, such that if a group of citizens is willing to vote for additional taxes to provide additional educational advantages. *San Antonio School Dist. v. Rodriguez*, 411 U.S. 1 at 47–54, 36 L. Ed. 16 at 51-55, 93 S.Ct. 1278 at 1303-1307.

[38] W.Va. Code, 18-9A-11, in pertinent part, reads:

"The tax commissioner shall make or cause to be made an appraisal in the several counties of the State of all nonutility real

ute places certain mandatory duties on county courts to allocate out of its levies sufficient funds to produce for county boards of education amounts they would have received had the Tax Commissioner's appraisals been followed.[39]

Upon remand, evidence must be developed to prove whether Lincoln County's low property tax revenue results from faulty appraisements below those set by the Tax Commissioner. It will also be necessary to calculate

---

property and of all nonutility personal property which shall be based upon true and actual value as set forth in article three [§ 11-3-1 et seq.], chapter eleven of this Code.

. . . .

"Whenever in any year a county assessor or a county court shall fail or refuse to comply with the provisions of this section in setting the valuations of property for assessment purposes in any class or classes of property in the county, (1) the state tax commissioner shall review the valuations for assessment purposes made by the county assessor and the county court and (2) shall direct the county assessor and the county court to make such corrections in the valuations as may be necessary so that they shall comply with the requirements of chapter eleven [§ 11-1-1 et seq.] of this Code and of this section, and (3) the tax commissioner shall enter the county and fix the assessments at the required ratios. (4) Refusal of the assessor or the county court to make such corrections shall constitute grounds for removal from office." [Numbering supplied]

[39] W.Va. Code, 18-9A-11, reads in pertinent part:

"In any year in which the total assessed valuation of a county shall fail to meet the minimum requirements above set forth, the county court of such county shall allocate for such year to the county board of education from the tax levies allowed to the county court a sufficient portion of its levies as will, when applied to the valuations for assessment purposes of such property in the county, provide a sum of money equal to the difference between the amount of revenue which will be produced by application of the allowable school levy rates defined in setion two [§ 18-9A-2] of this article upon the valuations for assessment purposes of such property and the amount of revenue which would be yielded by the application of such levies to fifty percent of the total of appraised valuations of such property. (5) In the event the county court shall fail or refuse to make the reallocation of levies as provided for herein, the county board of education, the tax commissioner, the state board, or any other interested party, shall have the right to enforce the same by writ of mandamus in any court of competent jurisdiction." [Numbering supplied]

the amount of deficiency, if any, to determine the true impact of the State financing formula in Lincoln County.[40] Moreover, inquiry must be directed in other low property revenue counties to determine if the appraisement provisions are being followed.[41]

It is obvious that W.Va. Code, 18-9A-11, reflects legislative perception that equality in property taxes could not occur until uniform property appraisements were set in the various counties. The Legislature's intent to have this section complied with is demonstrated by these broad enforcement and penalty provisions:

> (1) "[T]he state tax commissioner shall review the valuations for assessment purposes made by the county assessor and the county court ...

> (2) "[The state tax commissioner] shall direct the county assessor and the county court to make such corrections in the valuations as may be necessary so that they shall comply with the requirements of chapter eleven [§ 11-1-1 et seq.] of the Code and of this section, ...

> (3) "[T]he [state] tax commissioner shall enter the county and fix the assessments at the required ratios. . . .

> (4) "Refusal of the assessor or the county court to make such corrections shall constitute grounds for removal from office.

> (5) "In the event the county court shall fail or refuse to make the reallocation of levies as provided for herein, the county board of education, the tax commissioner, the state board, or any other interested party, shall have the right to enforce the same by writ of mandamus in any

---

[40] We have previously discussed in note 35 some inquiries that must be made to determine if the Lincoln County Court is making up any deficiency between the actual appraisements and the State Tax Commissioner's appraisements.

[41] Because of the mandatory duties placed by the Legislature on the State Tax Commissioner under W.Va. Code, 18-9A-11, he is clearly an indispensible party in any suit to declare the State school funding statute unconstitutional.

court of competent jurisdiction." [W.Va. Code, 18-9A-11]

To the extent that *State ex rel. Raese v. Battle*, 149 W. Va. 761, 143 S.E.2d 328 (1965), states that the Tax Commissioner is without power to proceed to enforce the provisions of W.Va. Code, 18-9A-11, it is overruled.

### The State School Building Fund

Another concern is apportionment of the State School Building Fund under W.Va. Code, 18-9C-1, *et seq.*, and particularly the entitlements set out in Section 5. The basic question is whether these funds are allocated in a manner that will provide essential physical facilities to meet the thorough and efficient standard. Again, expert testimony will be needed to develop the appropriate standard. Lincoln County school facilities must be tested by this standard, with some regard to an overall efficient plan.

### The State's Administrative Role

#### State Board of School Finance

The Legislature almost forty years ago recognized that: "Because of the adoption of the Tax Limitation Amendment, it has become necessary for the State to participate to an increasing degree in the financing of the free public schools." W.Va. Code, 18-9B-1. It passed what is now W.Va. Code, 18-9B-1, *et seq.*, creating the State Board of School Finance and giving it a variety of administrative and budgetary powers over county boards of education.

While there is no need at this time to review each of the provisions of this Article, the trial court on remand should ascertain if the State Board of School Finance has carried out its responsibilities under this Article, and whether Lincoln County has complied with this Article.

#### State Superintendent of Schools and State Board of Education

W.Va. Code, 18-9A-17, expressly provides that performance of powers and duties given to the State Board of School Finance under W.Va. Code, 18-9B-1, *et seq.*, is

ultimately the responsibility of the West Virginia Board of Education and its chief executive officer, the State Superintendent of Schools:

> "Notwithstanding any and all references to the board of school finance as found in article nine-B [§ 18-9B-1 et seq.] of this chapter, the West Virginia board of education, through its chief executive officer, shall direct and carry out all provisions of said article nine-B." [W.Va. Code, 18-9A-17]

Consequently, the trial court should require development of the facts about performance of those duties.

It is also clear that under W.Va. Code, 18-9A-11, the State Board of Education is required to calculate the county's property tax revenues which are subtracted from the State foundation aid. Inquiry should be made to determine if it is complying with this section. This would include determining what appraisement figures it obtains from the State Tax Commissioner.

According to W.Va. Code, 18-2-23, the West Virginia Board of Education, through the State Superintendent of Schools, has been required since 1965 to establish "a comprehensive educational program or programs in county school systems." This section also provides for evaluation of existing county school systems on a continuing basis to detect deficiencies and to make recommendations to correct deficiencies.

Certainly on remand the trial court should require a full production of the plans, studies and recommendations made by the Board and the State Superintendent to Lincoln County and State-wide. These studies should be useful in development of standards for a thorough and efficient school system.

We have previously pointed out that our thorough and efficient constitutional mandate requires something more than a mere equality of educational funding to the counties. *Brotherton v. Blankenship, supra,* holds:

> "Article 12, Section 1 of the Constitution of West Virginia provides: 'The legislature shall provide, by general law, for a thorough and efficient

system of free schools'. It has been held that this section requiring the establishment and maintenance of free schools is an absolute and mandatory duty on the part of the Legislature. State ex rel. Trent v. Sims, 138 W.Va. 244, 77 S.E.2d 122 (1953). . . . It is the view of this Court that the foregoing adequately reflects the will of the people, through the basic law enacted by them, that a *thorough and efficient system of free schools is of paramount importance in a free society and that neither the legislature nor the executive branch of government may perform any act which would result in the elimination of this safeguard.*" [Emphasis supplied] [____ W.Va. at ____, 207 S.E.2d at 436]

It is perhaps appropriate at this point to digress to one of the problems that we see in the record before us. It contains a number of statistical tables and studies with little information about their relevance. Affidavits are admissible in this type of action which is heard without jury, but it will be useful on remand to have evidence elicited about purposes, and explanations of the background compilations of data. Opposing parties may, of course, cross-examine affiants.

*The Local Role*

It is essential that a determination be made on remand, that the Lincoln County Board of Education is fulfilling its responsibilities imposed by the thorough and efficient mandate, in administering its school system.

Certainly, the State Superintendent of Schools, as well as the Lincoln County Superintendent of Schools, should have direct input in this area. These constitutional officers are trained professionals who are required to implement the policies of the State Board of Education and the County Board of Education. Their statutory duties are set out in W.Va. Code, 18-3-1, *et seq.,* and 18-4-1, *et seq.*

Particular attention is directed to W.Va. Code, 18-5-11, permitting joint establishment of schools by the County Boards of Education of two or more adjoining counties

as they operate in conjunction with the authority vested in County Boards under W.Va. Code, 18-5-13, to close and consolidate schools. Obviously, economy and efficiency may be affected by the number of duplicate school facilities that are being operated in the same county.

On remand, some judgment must be made by educational experts as to whether, under the existing statutes, the Lincoln County school system is being operated in a reasonably efficient manner, before any ultimate decision can be made that the present statutory scheme fails to deliver a thorough and efficient education.

*Parties*

The Constitution mandates legislative responsibility for a State-wide thorough and efficient school system. The trial court should, upon remand, require the suit to be amended to include the Speaker of the House of Delegates and the President of the Senate of West Virginia as defendants.[42] Undoubtedly, the expert studies made by various legislative committees will assist in the ultimate formulation of standards for the system. Legislative representatives should have an opportunity to fully explore any of the theories or statistics in the plaintiffs' case to demonstrate any possible errors or deficiencies. As we have said, legislative determinations of standards would be very important and persuasive to us.

We have previously noted that other essential parties are the State Tax Commissioner, the Lincoln County Superintendent, its School Board, its Assessor and County Court, all of whom are charged with mandatory roles under this State's educational statutes.

## CONCLUSION

A "Sketch of the Erection and Formation of the State of West Virginia from the Territory of Virginia," a prefix

---

[42] We have recognized that a suit involving State officials asserting the unconstitutionality of a State statute is not barred as a suit against the State under Article VI, Section 35 of our State Constitution. *See, e.g., Farley v. Graney,* 146 W.Va. 22, 119 S.E.2d 833 (1960); *Board of Education of Wyoming County v. Board of Public Works,* 144 W.Va. 593, 109 S.E.2d 552 (1959).

to 1 W.Va., was included in our first Reporter, "in order that the events therein recorded may not pass from the memory, and at the same time to provide some accessible memoranda, useful to the lawyer in his practice and convenient for reference by all." [1 W.Va. Preface]

The "sketch" at pages 72-73, during discussion about our 1863 Constitution, has these comments:

> "But the feature of the instrument that demonstrates most clearly the spirit of enlightened patriotism and enlarged sense of genuine interest in the cause of humanity, was the liberal provision for the establishment of a system of free schools."[43]

Our basic law makes education's funding second in priority only to payment of the State debt, and ahead of every other State function. Our Constitution manifests, throughout, the people's clear mandate to the Legislature, that public education is a *prime* function of our State government.[44] We must not allow that command to be unheeded.

We reverse the judgment of the Circuit Court and remand this case for proceedings as directed.

*Reversed and remanded.*

## APPENDIX I
### CLAUSES IN STATE CONSTITUTIONS PROVIDING FOR SCHOOL SYSTEMS

ALA. CONST. art. 14, § 256: "The legislature shall establish, organize, and maintain a liberal system of public schools throughout the state for the benefit of the

---

[43] Contrast the apparently humorous remark in the report of a speech by Delegate McKaig, *Debates of the Maryland Constitutional Convention of 1867* at 247:

"He had, some years ago, reviewed the public school systems of the different States and of Europe, and he had come to the conclusion that public schools were humbugs, but as the people seemed to think there was something in them, therefore he was content to admit that there was something in them. . . ."

[44] The patriots of this State were never afflicted with "an Appalachian mentality that finds nobility in ignorance. . . ." Leonard T. Anderson, *No Ethical Justification*, Charleston Gazette, Jan. 3, 1979, at 9A, Col. 1.

children thereof ...”; ALASKA CONST. art. VII, § 1: The legislature shall by general law establish and maintain a system of public schools open to all children of the State ...”; ARIZ. CONST. art. XI, § 1: The Legislature shall enact such laws as shall provide for the establishment and maintenance of a general and uniform public school system ...”; CAL. CONST. art. IX, § 5: “The Legislature shall provide for a system of common schools.”; CONN. CONST. art. 8, § 1: “There shall always be free public elementary and secondary schools in the state.”; FLA. CONST. art. IX, § 1: “Adequate provision shall be made by law for a uniform system of free public schools.”; GA. CONST. art. 8, § 1: “The provision of an adequate education for the citizens shall be a primary obligation of the State of Georgia, the expense of which shall be provided for the taxation.”; HAWAII CONST. art. IX, § 1: “The State shall provide for the establishment, support and control of a state-wide system of public schools ...”; IND. CONST. art. VIII, § 1: “Knowledge and learning, generally diffused throughout a community, being essential to the preservation of a free government; it shall be the duty of the General Assembly to encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement; and to provide, by law, for a general and uniform system of Common Schools ...”; IOWA CONST. art. IX, § 12: “The Board of Education shall provide for the education of all the youths of the State, through a system of Common Schools ...”; KAN. CONST. art. 6, § 1: “The legislature shall provide for intellectual, educational, vocational and scientific improvement by establishing and maintaining public schools ...”; LA. CONST. art. VIII, § 1: “The legislature shall provide for the education of the people of the state and shall establish and maintain a public educational system.”; ME. CONST. art. VIII, § 1: “A general diffusion of the advantages of education being essential to the preservation of the rights and liberties of the people; to promote this important object, the Legislature are authorized, and it shall be their duty to require, the several towns to make suitable provision, at

their own expense, for the support and maintenance of public schools."; MASS. CONST. Chap. V, § II: "Wisdom and knowledge, as well as virtue, diffused generally among the body of the people, being necessary for the preservation of their rights and liberties; and as these depend on spreading the opportunities and advantages of education on the various parts of the country, and among the different orders of the people, it shall be the duty of legislatures and magistrates, in all future periods of the Commonwealth, to cherish the interests of literature and the sciences, and all seminaries of them ..."; MICH. CONST. art. VIII, § 2: "The Legislature shall maintain and support a system of free public elementary and secondary schools as defined by law. Every school district shall provide for the education of its pupils without discrimination ..."; MISS. CONST. art. 8, § 201: "The Legislature may, in its discretion, provide for the maintenance and establishment of free schools for all children ..."; MO. CONST. art. IX, § 1 (a): "A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the general assembly shall establish and maintain free public schools ..."; NEB. CONST. art. VII, § 1: "The Legislature shall provide for the free instruction in the common schools of this state of all persons ..."; NEV. CONST. art. 11, § 2: "The legislature shall provide for a uniform system of common schools, by which a school shall be established and maintained in each school district ..."; N. H. CONST. art. 83: "Knowledge and learning, generally diffused through a community, being essential to the preservation of a free government; and spreading the opportunities and advantages of education ..."; N. M. CONST. art. XII, § 1: "A uniform system of free public schools sufficient for the education of, and open to, all the children of school age in the state shall be established and maintained."; N. Y. CONST. art. 11, § 1: "The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated."; N. C. CONST. art. IX, § 2 (1): "The Gener-

al Assembly shall provide by taxation and otherwise for a general and uniform system of free public schools ...";  N. D. CONST. art. VIII, § 147: "A high degree of intelligence, patriotism, integrity and morality on the part of every voter in a government by the people being necessary in order to insure the continuance of that government and the prosperity and happiness for the establishment and maintenance of a system of public schools ...";  OKLA. CONST. art. 13, § 1: "The Legislature shall establish and maintain a system of free public schools wherein all the children of the State may be educated.";  OR. CONST. art. VIII, § 3: "The Legislative Assembly shall provide by law for the establishment of a uniform, and general system of Common Schools.";  R. I. CONST. art. XII, § 1: "The diffusion of knowledge, as well as of virtue, among the people, being essential to the preservation of their rights and liberties, it shall be the duty of the general assembly to promote public schools, and to adopt all means which they may deem necessary and proper to secure to the people the advantages and opportunities of education.";  S. C. CONST. art. XI, § 3: "The General Assembly shall provide for the maintenance and support of a system of free public schools open to all children in the State.";  S. D. CONST. art. 8, § 1: "The stability of a republican form of government depending on the morality and intelligence of the people, it shall be the duty of the legislature to establish and maintain a general and uniform system of public schools ...";  TENN. CONST. art. 11, § 12: "Knowledge, learning, and virtue, being essential to the preservation of republican institutions, and the diffusion of the opportunities and advantages of education throughout the different portions of the State, being highly conducive to the promotion of this end, it shall be the duty of the General Assembly in all future periods of this Government, to cherish literature and science.";  UTAH CONST. art. X, § 1: "The Legislature shall provide for the establishment and maintenance of a uniform system of public schools ...";  VT. CONST., § 64: "Laws for the encouragement of virtue and prevention of vice and immorality, ought to

be constantly kept in force, and daily executed; and a competent number of schools ought to be maintained in each town unless the General Assembly permits other provisions for the convenient instruction of youth ...";
WASH. CONST. art. 9, § 2: "The Legislature shall provide for a general and uniform system of public schools ..."; WIS. CONST. art. X, § 3: "The legislature shall provide by law for the establishment of district schools, which shall be as nearly uniform as practicable ...";
WYO. CONST. art. 7, § 1: "The legislature shall provide for the establishment and maintenance of a complete and uniform system of public instruction, embracing free elementary schools of every needed kind and grade, a university with such technical and professional departments as the public good may require and the means of the state allow, and such other instructions as may be necessary."

## APPENDIX II

## A HISTORY OF EDUCATION IN WEST VIRGINIA

### BY CHARLES H. AMBLER

Dr. Charles H. Ambler, in his *A History of Education in West Virginia (From Early Colonial Times to 1949)* (1951), made perceptive observations about our government's fidelity to providing thorough and efficient education at various periods since 1863.

> In keeping with the conservative tendencies incident to the Panic of 1873 the state school levy remained constant at ten cents during this period. The maximum district levy of fifty cents was also unchanged, but the actual levies varied from county to county as determined by their respective wealth and programs. For instance, ten wealthy counties with an average levy of 18.5 cents for 1873-74 had an average term of four and one-half months, whereas ten poorer counties with an average levy of 39.5 cents had only three and one half months. Furthermore, the average levies of all the counties, aggregating about sixty cents for schools and buildings, plus the state levy for

the same year, would have produced a total of about $1,000,000, but under the current practices the total was only $647,000 which did not include $83,000 in capitations.

In adhering to these inequalities West Virginia was most inconsistent. One of the chief grievances of her former residents against the mother state was that she had taxed the many to educate a few. In turn, the daughter state adhered to the same practice, except that instead of favoring landed aristocrats and the indigent poor, she favored "Ironheaded Industrialists," as residents of the Ohio River counties were sometimes called. From time to time rural units protested against this situation, but they were helpless. More than anything else perhaps these inequalities retarded educational progress in a large part of the state.

The development was in face of the fact that the constitution required the legislature to provide a "thorough and efficient" system. Instead, the actual system, beginning under the Radical leadership which refused to shift the tax burden from the local units to the state, was much like a lot of tumbled down shanties and hovels with here and there in a fine house. From the standpoint of a statewide system the "fine house" was a hurdle. To scale it "Citizen" in a letter to the *Wheeling Register* for November 9, 1878, suggested that the constitution be enforced. For that purpose, he would have made the county the administrative unit.

Instead of enforcing the constitution, industrial and agrarian interests took advantage of the depressed economic conditions following 1873 to escape tax burdens. Worse still perhaps, they cultivated a poverty complex from which the state has not yet recovered. In response thereto the 1875 legislature exempted certain farm products from taxation, together with the products of mines, salt wells, oil wells and all manufactured products resulting from mechanical skill and labor. Taking advantage of tax exempt chargers

granted by Virginia, railroads were meanwhile paying mere pittances in taxes. As a result of these exemptions and practices the total assessed valuation for the entire state in 1883 was about $11,000,000 less than in 1875, but the legislature, ignoring repeated requests from the governor, failed to correct the situation. Thus the entire educational system, including the state normal schools and the University, languished for lack of financial support.

And about the three decades between 1880 and 1909:

Unfortunately for the state's educational interests, the corporate control of its industrial economy was largely non-resident. Inasmuch as there was little available resident capital, leaders vied with each other in making investments attractive to "out-of-state capital" which, with the tacit approval of the public generally and in defiance of the state constitution, was given assurances with respect to taxes and to public expenditures. In only a few instances did the leaders, either resident or non-resident, oppose public free schools, but they became a secondary instead of a primary interest, as in the pre-Civil War and the Reconstruction period. Under such conditions the educational leadership and the teaching personnel, with notable exceptions, tended to become second rate, and a tendency, begun in the Reconstruction, of looking to the North for every good thing was heightened. Thomas Jefferson, Dr. Henry Ruffner, and even White and Wade were all but forgotten. Incidentally, the poverty complex of the Reconstruction took on an inferiority complex which, more than anything else perhaps, tended to thwart individual initiative in education. Under the circumstances it was not expected and, when it did appear, it was regarded with suspicion.

Much of the maladjustment of this period may be accounted for by the fact that the changes were the result of a revolution. To appreciate this, it is recalled that West Virginians, as of 1880

and as determined by their mode of life, were as old as the Babylonians, in that some of them were still using such primitive tools as flails and sickles. At the end of this period most of them were still practicing domestic economy, but an increasing number resided in towns and cities and depended upon industry for subsistence. Because of the limitations of human nature and because of their failure to give more attention to education, they had thus been deprived of a due share of their birthright, in that their natural resources were being exploited rather than developed. Moreover, throughout large areas the inhabitants had been overtaken and in many cases submerged by an arrested economic development. Thus the "thorough and efficient system of free schools" authorized in the constitution failed to materialize.
(205-7).

Illustrating the times, Dr. Ambler wrote:

West Virginia had already joined New Jersey in the market-place for charters for corporations and made a point of asking few or no questions about their character. For that purpose, the secretary of state of West Virginia, carrying the Great Seal of the state with him, had gone to New York City in 1890 and opened temporary sales quarters in a downtown hotel, where, at "the lowest prices," he issued "all and sundry who wished them."
(389).

He discussed our school financing in the following decades:

The worst feature of the entire system was its stultifying inqualities. For instance, the per capital wealth per student in the 1920's varied from $841 in Jumping Branch District, Summers County, to $14,664 in Cass District, Monongalia County. The thirty cent levy on these values yielded $1.59 for each child in the former and $48.90 in the latter. At the same time, active

rates of taxation for school purposes varied from 37 cents in Freeman's Creek District, Lewis County, to $2.22 in Ripley Independent District, Jackson County. For the year ending 1917 the school term in thirty-seven districts varied from seventy-five to one hundred ten days of the required six month term, and the Survey of Education, made ten years later, indicated that children in rural districts with short terms and poor teachers were far behind children who attended city and consolidated schools.

The chief difficulty lay in the fact that the wealth of the state was amassed in spots and sections, while other spots and sections were without taxable wealth to support even good elementary schools. As a consequence, in 1924 terms varied from 180 days in fifty-three districts to 160 days or less in three hundred forty-four districts, and the average per capita cost in districts with the longer terms was much less than in those with shorter terms. In the former, buildings and equipment were of the finest sort, whereas in the latter children were crowded into "huts," unpainted and bare, poorly heated, rudely furnished, without libraries and sanitary outbuildings. Moreover, the best teachers were in the wealthy districts which were also provided with supervisors and special instructors in music, drawing, and other subjects. In face of the law requiring property to be assessed at its full and actual value, the assessments in some counties were lowered from year to year so as to boost their shares of the supplemental funds. (439-40).

Dr. Ambler recites in substantial detail, the financial, political and personal involvements in the history of West Virginia education. We suggest perusal of his sections on West Virginia school financing which expose not only the sums invested in education from state and local sources into the 1940's, but the effect our constitutional Tax Limitation Amendment had upon the relative contributions made by local and state taxation.

## APPENDIX III

## EDUCATION PROVISIONS FROM THE WEST VIRGINIA CONSTITUTION

### ARTICLE XII.

1. The legislature shall provide, by general law, for a thorough and efficient system of free schools.

2. The State Superintendent of Free Schools shall have a general supervision of free schools, and perform such other duties in relation thereto as may be prescribed by law. If in the performance of any such duty imposed upon him by the Legislature, he shall incur any expenses, he shall be reimbursed therefor: *Provided,* the amount does not exceed five hundred dollars in any one year.

3. The Legislature may provide for County Superintendents, and such other officers as may be necessary to carry out the objects of this Article, and define their duties, powers and compensation.

4. The existing permanent and invested school fund, and all money accruing to this State from forfeited, delinquent, waste and unappropriated lands; and from lands heretofore sold for taxes and purchased by the State of Virginia, if hereafter redeemed, or sold to others than this State; all grants, devises, or bequests that may be made to this State for the purposes of education, or where the purposes of such grants, devises, or bequests are not specified; this State's just share of the literary fund of Virginia, whether paid over or otherwise liquidated; and any sums of money, stocks, or property, which this State shall have the right to claim from the State of Virginia for educational purposes; the proceeds of the estates of persons who may die without leaving a will or heir, and of all escheated lands; the proceeds of any taxes that may be levied on the revenues of any corporation; all moneys that may be paid as an equivalent for exemption from

military duty; and such sums as may, from time to time, be appropriated by the Legislature for the purpose, shall be set apart as a separate fund, to be called the "School Fund," and invested under such regulations as may be prescribed by law, in the interest bearing securities of the United States, or of this State, or if such interest bearing securities cannot be obtained, then said "School Fund" shall be invested in such other solvent interest bearing securities as shall be approved by the Governor, Superintendent of Free Schools, Auditor and Treasurer, who are hereby constituted the "Board of the School Fund," to manage the same, under such regulations as may be prescribed by law; and the interest thereof shall be annually applied to the support of free schools throughout the State, and to no other purpose whatever. But any portion of said interest remaining unexpended at the close of a fiscal year, shall be added to, and remain a part of, the capital of the "School Fund:" *Provided,* That all taxes which shall be received by the State upon delinquent lands, except the taxes due to the State thereon, shall be refunded to the county, or district by or for which the same were levied.

5. The Legislature shall provide for the support of Free Schools, by appropriating thereto the interest of the invested "School Fund," the net proceeds of all forfeitures and fines accruing to this State under the laws thereof; the State capitation tax; and by general taxation on persons and property or otherwise. It shall also provide for raising, in each county or district, by the authority of the people thereof, such a proportion of the amount required for the support of Free Schools therein as shall be prescribed by general laws.

6. The school districts into which any county is now divided, shall continue until changed in pursuance of law.

7. All levies that may be laid by any county or district for the purpose of Free Schools, shall be reported to the Clerk of the County Court, and

shall, under such regulations as may be prescribed by law, be collected by the Sheriff, or other collector, who shall make annual settlement with the County Court; which settlements shall be made a matter of record by the Clerk thereof, in a book to be kept for that purpose.

8. White and colored persons shall not be taught in the same school.

9. No person connected with the free school system of the State, or with any educational institution of any name, or grade under State control, shall be interested in the sale, proceeds or profits of any book or other thing used, or to be used therein, under such penalties as may be prescribed by law: *Provided*, that nothing herein shall be construed to apply to any work written, or thing invented, by such person.

10. No independent free school district, or organization shall hereafter be created, except with the consent of the school district or districts out of which the same is to be created, expressed by a majority of the voters voting on the question.

11. No appropriation shall hereafter be made to any State Normal School, or branch thereof, except to those already established, and in operation, or now chartered.

12. The Legislature shall foster and encourage moral, intellectual, scientific and agricultural improvement; it shall, whenever it may be practicable, make suitable provision for the blind, mute and insane, and for the organization of such institutions of learning as the best interests of general education in the State may demand.

Other of our constitution's provisions mention education:

Article 10, § 5: "The power of taxation of the legislature shall extend to provision for the payment of the state debt, and interest thereon, *the support of free schools*, and the payment of the annual estimated expenses of the State; . . ." [Our emphasis.]

Section 7 limits county authorities: They "... shall never assess taxes, in any one year, the agregate of which shall exceed ninety-five cents per one hundred dollars valuation; *except for the support of free schools*; payment of indebtedness ..." unless the people of the county approve by three-fifths of the votes cast. [Our emphasis.]

Section 10, called "Better Schools Amendment," states: "Notwithstanding any other provision of the Constitution to the contrary, the maximum rates authorized and allocated by law for tax levies on the several classes of property for the support of public schools may be increased in any school district ..."

Amendments include "The Irreducible School Fund Amendment" and the "Better School Buildings Amendment."

## THE IRREDUCIBLE SCHOOL FUND AMENDMENT
### (1902)

The accumulation of the school fund provided for in section four of article twelve, of the Constitution of this State, shall cease upon the adoption of this amendment, and all moneys to the credit of said fund over one million dollars, together with the interest on said fund, shall be used for the support of the free schools of the State.

Section 2 of the Education Article was amended in 1957 and ratified in 1958. Today this section reads as follows:

### SUPERVISION OF FREE SCHOOLS

§ 2. The general supervision of the free schools of the State shall be vested in the West Virginia board of education which shall perform such duties as may be prescribed by law. The board shall consist of nine members to be appointed by the governor, by and with the advice and consent of the senate, for overlapping terms of nine years, except that the original appointments shall be for terms of one, two, three, four, five, six, seven,

eight, and nine years, respectively. No more than five members of the board shall belong to the same political party, and in addition to the general qualifications otherwise required by the Constitution, the legislature may require other specific qualifications for membership on the board. No member of the board may be removed from office by the governor except for official misconduct, incompetence, neglect of duty, or gross immorality, and then only in the manner prescribed by law for the removal by the governor of state elective officers.

The West Virginia board of education shall in the manner prescribed by law, select the state superintendent of free schools who shall serve at its will and pleasure. He shall be the chief school officer of the State and shall have such powers and shall perform such duties as may be prescribed by law.

The state superintendent of free schools shall be a member of the board of public works as provided by subsection B, section fifty-one, article six of this Constitution.

## BETTER SCHOOL BUILDINGS AMENDMENT (1972)

The legislature shall have power to authorize the issuing and selling of state bonds, not exceeding in the aggregate two hundred million dollars, which shall be in addition to all other state bonds heretofore authorized. The proceeds of the bonds hereby authorized to be issued and sold shall, notwithstanding the provisions of section six, article ten of this Constitution or any other provision of this Constitution to the contrary, be distributed to such county boards of education as qualify therefor by meeting such conditions, qualifications and requirements as shall be prescribed by general law and used and appropriated by such county boards of education solely for the construction, renovation or remodeling of elementary or secondary public school buildings or facilities, the equipping of the same in connection with any such construction, reno-

vation or remodeling and the acquisition and preparation of sites for elementary or secondary public school buildings or facilities. Such bonds may be issued and sold at such time or times and in such amount or amounts as the legislature shall authorize. When a bond issue as aforesaid is authorized, the legislature shall at the same time provide for the collection of an annual state tax sufficient to pay as it may accrue the interest on such bonds and the principal thereof within and not exceeding thirty-four years, and all such taxes so levied shall be irrevocably dedicated for the payment of principal of and interest on such bonds are finally paid and discharged, and any of the covenants, agreements or provisions in the acts of the legislature levying such taxes shall be enforceable in any court of competent jurisdiction by any of the holders of the bonds.

# APPENDIX IV

## FUNDS PER PUPIL 1977-78
## COUNTIES RANKED BY REGULAR LEVY

REGULAR LEVY ▨ FOUNDATION STATE AID ▨ SUPPLEMENTAL OUTSIDE FORMULA ▨ SPECIAL LEVY ▨

| County |
|--------|
| Grant |
| Marshall |
| Hancock |
| Pleasants |
| Putnam |
| Gilmer |
| Monongalia |
| Kanawha |
| Harrison |
| Ohio |
| Jackson |
| Cabell |
| Lewis |
| Hampshire |
| Webster |
| Boone |
| Doddridge |
| Marion |
| Brooke |
| Greenbrier |
| Ritchie |
| Hardy |
| Jefferson |
| Mason |
| Berkeley |
| Pocahontas |
| Wood |
| Nicholas |
| Preston |
| Wyoming |
| Barbour |
| Morgan |
| McDowell |
| Fayette |
| Calhoun |
| Clay |
| Wirt |
| Roane |
| Upshur |
| Raleigh |
| Pendleton |
| Mercer |
| Wetzel |
| Braxton |
| Randolph |
| Summers |
| Monroe |
| Logan |
| Taylor |
| Wayne |
| Tyler |
| Mingo |
| Mineral |
| Tucker |
| Lincoln |
| State Avg |

REGULAR LEVY
+FOUNDATION
STATE AID

| | |
|------|------|
| HIGH | 888 |
| AVERAGE | 766 |
| LOW | 677 |

REGULAR LEVY
+TOTAL STATE AID

| | |
|------|------|
| HIGH | 1069 |
| AVERAGE | 886 |
| LOW | 787 |

TOTAL INCLUDING
SPECIAL LEVY

| | |
|------|------|
| HIGH | 1428 |
| AVERAGE | 1036 |
| LOW | 832 |

$100  $200  $300  $400  $500  $600  $700  $800  $900  $1000 $1100 $1200 $1300 $1400

766

## APPENDIX V

## BIBLIOGRAPHY OF MATERIALS CONSULTED BUT NOT CITED

I. Texts and Monographs

R. D. Baldwin, *The Financing of Public Education in West Virginia.* (1938)

J. S. Burke and M. W. Kirst, *Federal Aid to Education: Who Benefits? Who Governs?* (1972)

J. Burkhead, *Public School Finance.* (1964)

P. E. Burrup, *Financing Education in a Climate of Change.* (1974)

J. E. Coons, et al., *Private Wealth and Public Education.*

W. I. Garns, et al., *School Finance: The Economics and Politics of Public Education.* (1978)

E. H. Greene, *West Virginia School Guide.* (1963)

J. E. Johnsen, *Federal Aid For Education.* (1941)

H. Kursh, *The United States Office of Education: A Century of Service.* (1975)

Legislative Interim Committee, *A Report of A Survey of Public Education in the State of West Virginia.* (1945)

B. S. Morgan and J. F. Cork, *History of Education in West Virginia.* (1945)

National Conference of State Legislatures, *School Finance Reform: A Legislature's Handbook.* (1976)

R. D. Reischauer and R. W. Hartman, *Reforming School Finance.* (1973)

H. S. Rowland and R. L. Wing, *Federal Aid for Schools.* (1970)

Senate Committee on Labor and Public Welfare, Subcommittee on Employment, Manpower and Poverty, *Senate Committee Hearing.* (1963)

D. B. Taylor, *School Laws of West Virginia.* (1973)

II. Periodicals

A. Lead Articles

1. Anderson, W. R., *North Shore School District v. Kinnear: The "General and Uniform" and*

736

*"Ample Provision" Clauses,* 38 LAW and CONTEMP. PROB. 366 (1974).

2. Areen, J. and Ross L., *The Rodriquez Case: Judicial Oversight of School Finance,* 1973 SUPREME COURT REV. 33 (1973).

3. Coons, J. E., *Introduction: "Fiscal Neutrality" After Rodriquez,* 38 LAW and CONTEMP. PROB. 299 (1974).

4. Gammon, T. E., *Equal Protection of the Law and San Antonio Independent School District v. Rodriquez,* 11 VAL. U. L. REV. 435 (1977).

5. Gard, S. W., *San Antonio Independent School District v. Rodriquez: On Our Way to Where?* 8 VAL. U. L. REV. 1 (1973).

6. Grubb, W. N., *The First Round of Legislative Reforms in the Post Serrano World,* 38 LAW and CONTEMP. PROB. 459 (1974).

7. Hain, E., Milliken v. Green: *Breaking the Legislative Deadlock,* 38 LAW and CONTEMP. PROB. 350 (1974).

8. Harrison, R., *What Now After San Antonio Independent School District v. Rodriquez?: Electoral Inequality and the Public School Finance Systems in California and Texas,* 5 RUT-CAM L. REV. 191 (1974).

9. Jennings, J. F., *Federal General Aid—Likely or Illusory,* 2 J. LAW. and ED. 89 (1973).

10. Karst, K. L., *Serrano v. Priest's Inputs and Outputs,* 38 LAW and CONTEMP. PROB. 333 (1974).

11. Levin, B., *Alternatives to the Present System of School Finance: Their Problems and Prospects,* 61 GEO. LAW J. 879 (1973).

12. Levin, B., *Recent Developments in the Law of Equal Educational Opportunity,* 4 J. LAW and ED. 411 (1975).

13. Lindquist, R. E., and Wise, A. E., *Developments in Education Litigation: Equal Protection,* 5 J. LAW and ED. 1 (1976).

14. Lutz, F. W. and Edgren, D. J., *School Finance: A Critical Look at Pennsylvania Act 125*, 5 J. LAW and ED. 317 (1976).

15. McCarthy, M. M., *Is the Equal Protection Clause Still a Viable Tool for Effecting Educational Reform?*, 6 J. LAW and ED. 159 (1977).

16. McDermott, J. E. and Klein, S. P., *The Cost-Quality Debate in School Finance Litigation: Do Dollars Make A Difference?*, 38 LAW and CONTEMP. PROB. 415 (1974).

17. Michelson, S., *Reform Through State Legislatures ...*, 38 LAW and CONTEMP. PROB., 436 (1974).

18. Porras, D. D., *The Rodriquez Case—A Crossroad in Public School Finance*, 26 TAX LAW 141 (1972).

19. Porter, N. C., *Rodriquez, the "Poor" and the Burger Court*: A Prudent Prognosis, 29 BAYLOR LAW REV. 199 (1977).

20. Roos, R. D., *The Potential Impact of Rodriquez on Other School Reform Litigation*, 38 LAW and CONTEMP. PROB. 566 (1974).

21. Sugarmun, S. D., *Other Educational Reforms ...*, 38 LAW and CONTEMP. PROB. 513 (1974).

22. Sugarman, S. D. and Kirp, D. L., *Rethinking Collective Responsibility for Education*, 39 LAW and CONTEMP. PROB. 144 (1975).

23. Timpane, P. M., *Reform Through Congress Federal Aid to Schools: It's Limited Future*, 38 LAW and CONTEMP. PROB. 493 (1974).

24. Tractenberg, P. L., *Robinson v. Cahill: The "Thorough and Efficient" Clause*, 38 LAW and CONTEMP. PROB. 312 (1974).

25. Yackle, L. W., *Thoughts on Rodriquez: Mr. Justice Powell and the Demise of Equal Protection Analysis in the Supreme Court*, 9 V. RICH. LAW REV. 181 (1975).

26. Yodof, M. G. and Morgan, D. C., *Rodriquez v. San Antonio Independent School District:*

*Gathering the Ayes of Texas—The Politics of School Finance Reform*, 38 LAW and CONTEMP. PROB. 383 (1974).

B. Student Notes and Comments

1. - - - *Constitutional Law—A Comparison of Missouri and Federal Standards for State Aid to Non-Public Schools*, 42 MO. LAW REV. 618 (1977).
2. - - - *Constitutional Law—Equal Protection—Validity of Texas School Financing System*, 12 DUQ. LAW REV. 348 (1973).
3. - - - *Equal Protection of the Laws: Education is Not a Fundamental Right*, 26 U. FLA. LAW REV. 155 (1973).
4. - - - *San Antonio Independent School District v. Rodriquez: A Retreat from Equal Protection*, 22 CLEV: S. LAW REV. 585 (1973).
5. - - - *San Antonio Independent School District v. Rodriquez: A Study of Alternatives Open to State Courts*, 8 U. SAN FRAN. LAW REV. 90 (1973).

## APPENDIX VI

## TABLE OF CASES EXAMINED BUT NOT CITED

1. *Griffin v. County School Board of Prince Edward County*, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964).
2. *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, (1963).
3. *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, (1954).
4. *Evans v. Buchanan*, 379 F. Supp. 1218 (D. Del. 1974).
5. *Parker v. Mandel*, 344 F. Supp. 1068 (D. Md. 1972).
6. *Adkins v. School Board of Newport News, Virginia*, 148 F. Supp 430 (E. D. Va. 1957).

7. *Mills v. Lowndes*, 26 F. Supp. 792 (D. Md. 1939).

8. *Fitzhugh v. Ford*, 230 Ark. 531, 323 S.W.2d 559 (1959).

9. *Webb v. Adams*, 180 Ark. 713, 23 S.W.2d 617 (1929).

10. *Ruff v. Womack*, 174 Ark. 971, 298 S.W. 222 (1927).

11. *Krause v. Thompson*, 138 Ark. 571, 211 S.W. 925 (1919).

12. *Game and Fish Commission of Colorado v. Feast*, 157 Colo. 303, 402 P.2d 169 (1965).

13. *Zavilla v. Masse*, 112 Colo. 183, 147 P.2d 823 (1944).

14. *Wilmore v. Annear*, 100 Colo. 106, 65 P.2d 1433 (1937).

15. *Duncan v. People ex rel. Moser*, 89 Colo. 149, 299 P. 1060 (1931).

16. *People ex rel. Vollmar v. Stanley*, 81 Colo. 276 (1927).

17. *Schwartz v. People*, 46 Colo. 239 (1909).

18. *Hockaday v. Bd. of County Commissioners*, 1 Colo. App. 362 (1892).

19. *Husbands v. Talley*, 3 Penne. 88, 47 A. 1009 (1901).

20. *Anneker v. Quinn-Robbins Co.*, 80 Idaho 1, 323 P.2d 1073 (1958).

21. *Electors of Big Butte Area v. State Board of Education*, 78 Idaho 602, 308 P.2d 225 (1957).

22. *Davis v. Moon*, 77 Idaho 146, 289 P.2d 614 (1955).

23. *Bullock v. Joint Class "A" School Dist. No. 241*, 75 Idaho 304, 272 P.2d 292 (1954).

24. *Independent School District v. Common School Dist. No. 38*, 64 Idaho 303, 131 P.2d 786 (1942).

25. *Scandrett v. Shoshone County*, 63 Idaho 46, 116 P.2d 225 (1941).

26. *Idaho-Western Railroad v. Columbia Conference of Evangelical Lutheran Augustana Synod*, 20 Idaho 568, 119 P. 60 (1911).

27. *City of Pana v. Crowe*, 13 Ill. App. 3d 90, 299 N.E.2d 770, (1973).

28. *Allen v. Maurer*, 6 Ill. App. 3d 633, 286 N.E.2d 135 (1972).

29. *Peters v. South Chicago Community Hospital*, 44 Ill. 2d 22, 253 N.E.2d 375 (1969).

30. *Smith v. Board of Education of Oswego Community High School District*, 405 Ill. 143, 89 N.E.2d 893 (1950).

31. *Sloan v. School Directors of District No. 22*, 373 Ill. 511, 26 N.E.2d 846 (1940).

32. *Board of Education of Louisville v. Society of Alumni of Louisville High School, Inc.*, 239 S.W.2d 931 (Ky. 1951).

33. *Jefferson County Board of Education v. Goheen*, 306 Ky. 439, 207 S.W.2d 567 (1948).

34. *Madison County Board of Education v. Smith*, 250 Ky. 495, 63 S.W.2d 620 (1933).

35. *Talbott v. Kentucky State Board of Education*, 244 Ky. 826, 52 S.W.2d 727 (1932).

36. *Elliott v. Garner*, 140 Ky. 157, 130 S.W. 997 (1910).

37. *Commonwealth ex rel. v. Griffen*, 268 Ky. 830, 105 S.W.2d 1063 (1937).

38. *Fiscal Court of Logan County v. Board of Education of Logan County*, 138 Ky. 98, 127 S.W. 527 (1910).

39. *Prowse v. Board of Education for Christian County*, 134 Ky. 365, 120 S.W. 307 (1909).

40. *Wilson v. Board of Education of Montgomery County*, 234 Md. 561, 200 A.2d 67 (1964).

41. *State ex rel. Clark v. Maryland Institute for the Promotion of Mechanic Arts*, 87 Md. 643 (1898).

42. *In re Cold Spring Granite Company*, 271 Minn. 460, 136 N.W.2d 782 (1965).

43. *Melby v. Hellie*, 249 Minn. 17, 80 N.W.2d 849 (1957).

44. *Muehring v. School Dist. No. 31*, 224 Minn. 432, 28 N.W.2d 655 (1947).

45. *State ex rel. Board of Christian Science of Lutheran Minnesota Conference v. School Board of Consolidated School District No. 3*, 206 Minn. 63, 287 N.W. 625 (1939).

46. *McSherry v. City of St. Paul*, 202 Minn. 102, 277 N.W. 541 (1938).

47. *State v. Cloudy & Travers*, 159 Minn. 200, 198 N.W. 457 (1924).

48. *State ex rel. Smith v. City of St. Paul*, 128 Minn. 82, 150 N.W. 389 (1914).

49. *State v. North American Car Corporation*, 118 Mont. 183, 164 P.2d 161 (1945).

50. *State ex rel. School Dist. No. 29 v. Cooney*, 102 Mont. 521, 59 P.2d 48 (1936).

51. *Perkins v. Trask*, 95 Mont. 1, 23 P.2d 982 (1933).

52. *State ex rel. Henderson v. Dawson County*, 87 Mont. 122, 286 P. 125 (1930).

53. *Board of Education of Rockaway v. Rockaway Township Education Association*, 120 N.J. Super. 564, 295 A.2d 380 (1972).

54. *West Morris Regional Board of Education v. Sills*, 58 N.J. 464, 279 A.2d 609 (1971).

55. *R.R. v. Board of Education of Shore Regional High School District*, 109 N.J. Super. 337, 263 A.2d 180 (1970).

56. *Durgin v. Brown*, 37 N.J. 189, 180 A.2d 136 (1962).

57. *Everson v. Board of Education of Ewing Township*, 133 N.J.L. 350, 44 A.2d 333 (1945).

58. *Landis v. Ashworth*, 57 N.J.L. 509, 31 A. 1017 (1895).

59. *Board of Education of Cincinnati*, No. C-780001 (Ohio Ct. Common Pleas, September 5, 1978).

60. *Mercure v. Board of Education of Columbiana School District,* 49 Ohio App. 2d 409, 361 N.E.2d 273 (1976).

61. *Board of Education of Cleveland City School District v. Gilligan,* 36 Ohio App. 2d 15, 301 N.E.2d 911 (1973).

62. *Smith v. Board of Education,* 97 Ohio App. 507, 127 N.E.2d 623 (1954).

63. *State ex rel. Core v. Green,* 160 Ohio St. 175, 115 N.E.2d 157 (1953).

64. *Dornette v. Allais,* 76 Ohio App. 345, 63 N.E.2d 805 (1945).

65. *Gigandet v. Brewer,* 134 Ohio St. 86, 15 N.E.2d 964 (1938).

66. *Rapp v. Bethel-Tate Consolidated School District,* 58 Ohio App. 126, 16 N.E.2d 224 (1937).

67. *City of East Cleveland v. Board of Education of City School District,* 112 Ohio St. 607, 148 N.E. 350 (1925).

68. *Niehaus v. State ex rel. Board of Education of City School* District of Dayton, 111 Ohio St. 47, 144 N.E. 433 (1924).

69. *Searfoss v. White Haven Borough School District,* 397 Pa. 604, 156 A.2d 841 (1959).

70. *English v. Robinson Township School District,* 358 Pa. 45, 55 A.2d 803 (1947).

71. *Braun v. Trustees of Victoria Independent School District,* Tex. Ct. App., 114 S.W.2d 947 (1938).

72. *Cowan v. Clay County Board of Education,* Tex. Civ. App., 41 S.W.2d 513 (1931).

73. *County Board of School Trustees v. Bullock Common School District No. 12,* Tex. Civ. App., 37 S.W.2d 829 (1931).

74. *Ferguson v. Academy Consolidated Independent School District*, Tex. Civ. App., 14 S.W.2d 1051 (1929).

75. *Bloodworth v. Rhea*, Tex. Civ. App., 280 S.W. 1070 (1925).

76. *City of Fort Worth v. Davis*, 57 Tex. 225 (1882).

77. *City of Emporia v. County of Greensville*, 213 Va. 16, 189 S.E.2d 341 (1972).

78. *Kellam v. School Board of Norfolk*, 202 Va. 252, 117 S.E.2d 96 (1960).

79. *Almond v. Gilmer*, 188 Va. 1, 49 S.E.2d 431 (1948).

80. *Rogers v. Jones*, 115 W. Va. 320, 175 S.E. 781 (1934).

81. *Casto v. Upshur County High School Board*, 94 W. Va. 513, 119 S.E. 470 (1923).

82. *Buse v. Smith*, 74 Wis. 2d 550, 247 N.W.2d 141 (1976).

*TERRY GENE PAULEY, ETC., ET AL. V. JOHN H. KELLY, TREASURER, STATE OF WEST VIRGINIA, ET AL.*—NO. 14036

NEELY, JUSTICE, *dissenting:*

When the average bright law student first encounters the doctrine that courts will not decide "political questions," it usually appears that such deference to other authorities is more cowardice on the part of the judiciary than anything which passes for statesmanship. However, maturity brings a recognition that all power has its inherent limitations and I dissent on the grounds that the majority has overstepped the limits of a court.[1]

---

[1] The development of the "political question" doctrine runs from *Luther v. Borden*, 48 U.S. (7 How.) 1 (1849) to *Gilligan v. Morgan*, 413 U.S. 1 (1973). In *Luther* the Supreme Court was asked to recognize a rebel government of Rhode Island as opposed to the government established under the original colonial charter. The Court determined that they could not decide which state government was in power but that Congress had that power under the guaranty

State supported public education is an area where the other agencies of government are actively working while taking cognizance of other compelling yet competing imperatives, among which are included an appropriate lev-

clause, *U. S. Const.* art. 4, § 4, which it had delegated to the President. The Court seemed to intimate that if Congress possessed the power then the judiciary did not since it involved a question not susceptible to conflicting answers. Other nineteenth century cases, *Forsyth v. Hammond,* 166 U.S. 506 (1897); *Minor v. Happersett,* 88 U.S. (21 Wall.) 162 (1875) arose under the guaranty clause and followed Luther's lead to the extent of denying relief but recognized that the guaranty clause could be applied to protect individual rights. However, in *Pacific States Tel. & Tel. Co. v. Oregon,* 223 U.S. 118 (1912), the Supreme Court held that the question of whether a state government is "republican" was not capable of judicial resolution; the guaranty clause did not yield itself to judicial power since that would "obliterate the division between judicial authority and legislative power ..." 223 U.S. at 142. At that point it seemed that the constitutional provision relied on determined justiciability but that approach was abandoned by the plurality in *Colegrove v. Green,* 328 U.S. 549 (1946) where the Court held it could not reapportion voting districts by itself reasoning that the Constitution plainly granted the questioned power to Congress and "Courts ought not to enter this political thicket." 328 U.S. at 556. This analysis was decisively rejected in *Baker v. Carr,* 369 U.S. 186 (1962) where the Court clarified the doctrine as one of "political questions" not "political cases." 369 U.S. at 217. The Court returned to the traditional question of whether the constitutional provision invoked was susceptible to translation into judicially enforceable rights. Other political question cases, *Coleman v. Miller,* 307 U.S. 433 (1939); *Chicago & S. Air Lines v. Waterman S.S. Corp.,* 333 U.S. 103 (1948), evidenced the enforcement problem. Decisions since *Baker v. Carr, United States v. Nixon,* 418 U.S. 683 (1974); *Powell v. McCormack,* 395 U.S. 486 (1969), have remained true to its doctrine of enforceable rights, manageable standards, and constitutional commitment, but only one, *Gilligan v. Morgan,* 413 U.S. 1 (1973) (14th Amendment challenge to the training of the Ohio National Guard), has invoked the political question doctrine to hold an issue nonjusticiable reasoning that "it is difficult to conceive of an area of governmental activity in which the courts have less competence ... [than] professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches. 413 U.S. at 10. Thus the political question doctrine evolved, not as an off-limits sign on certain constitutional provisions, but as a requirement that courts consider whether *manageable* judicial standards can be developed in order to make certain rights *judicially* enforceable.

el of taxation, help for the aged, infirm, mentally ill, and destitute along with the more mundane demands upon the public treasury such as roads, sewers, fire protection and police protection.

Where the other agencies of government totally neglect the needs of a constituency entirely devoid of an effective political voice, as for example Black citizens in 1954, *Brown v. Board of Education*, 347 U.S. 483 (1954), mental health patients in 1974, *State ex rel. Hawks v. Lazaro*, ____ W.Va. ____, 202 S.E.2d 109 (1974) or juvenile status offenders in 1977, *State ex rel. Harris v. Calendine*, ____ W.Va. ____, 233 S.E.2d 318 (1977), it may be appropriate for a court to intervene in the political process under the authority of constitutional interpretation because there is no effective political alternative. These cases are distinguishable from the case at bar, however, by the fact that they presented problems susceptible to judicial management. In those cited instances there were structural obstacles to effective political participation by the abused constituency which only the courts could overcome on behalf of those to whom the political process was foreclosed. However, with regard to the particular invitation to judicial activism before as now, the Legislature has committees meeting constantly during its sessions on the subject of education; there is a huge bureaucracy dedicated to carrying out the legislative program; and, there are numerous, powerful, active constituencies who routinely devote time and money to effective (as well as ineffective) lobbying for education.

Many excesses of judicial zeal in attempts to solve problems of government may be analogized to an effort to reduce to possession a part of a balloon full of water; whenever a piece of the balloon is grasped towards the bottom, there will develop a bulge at the top. The courts do not have control of the entire balloon; the courts do not appropriate money; the courts do not tax; and, the courts do not have the manpower or expertise to enforce their orders absent the good will of the other branches. The personal philosophies of judges may prompt them to attempt to grab a piece of the water balloon, but the

bulge which the court creates must be handled by others who often decline to handle it. If then, the bulge is not handled, the courts, unless they are to become laughing stocks, must handle it, which will produce another bulge, until the courts are trying to control the entire balloon. At that point courts cease being courts and become administrators. Obviously when they become administrators they will also, *ipso facto*, become judges of their own causes and there ends the separation of powers. This is what the judges who developed the political question doctrine meant when they spoke of "judicially manageable standards."

The case before us presents an attempt by parents and public interest lawyers to pry more money from the Legislature while at the same time avoiding the cumbersome legislative/political process with all of the implications which that process entails that something more than the *mere* appropriation of money may be forthcoming. As originally brought, the suit did not challenge teacher incompetency, nor the existence of an enormous interlocking statutory scheme which guarantees that security of position for those within the educational establishment will take precedence over the education of children.[2] That statutory scheme is the result of political bargaining and must be corrected through political bargaining if the result is to have any legitimacy.

_____

[2] Under *W. Va. Code*, 18A-2-2 [1969], a teacher's contract with the county board of education becomes "continuing" after three years of employment and can be canceled only in one of two ways: (1) by the teacher's written resignation or (2) by majority vote of the full membership of the school board for cause. If cancellation is by vote of the school board, the teacher must be given an opportunity to be heard prior to cancellation and if cancellation is improper (not sufficient cause) the board can be subjected to monetary claims. *Mason County Board of Education v. State Superintendent of Schools*, ___ W.Va. ___, 234 S.E.2d 321 (1977). *See also W. Va. Code*, 18A-2-8 [1969] (dismissal of school personnel); *W. Va. Code*, 18A-3-1 [1969] (teacher certification); *W. Va. Code*, 18A-3-3 [1969] (permanent certification); and *W. Va. Code*, 18A-4-2 [1977] and *W. Va. Code*, 18A-4-2a [1977] (state minimum and supplemental salaries based exclusively on years experience and educational training without consideration of competency or quality of training).

"Thorough and efficient" education apparently does not mean in this modern world just advanced mathematics, chemistry, physics, foreign languages, competence in written and spoken English, and a well-developed knowledge of history. Something more in the form of vocational training and preparation for life is implied, yet whatever it is, it is far too unmanageable a standard to be developed in a vacuum devoid of political give and take by the logical judicial mind, because inherent in any consensus about "thorough and efficient" education is a difficult balance between irreconcilable value systems. I have my own ideas of what constitutes "thorough and efficient" education; nonetheless, I am constitutionally constrained not to force them down the throats of other equally well-informed persons who have different values merely because I am a judge.

Accordingly, as woeful as the West Virginia public education system is, I would affirm the judgment of the lower court because the entire question comes within the classic definition of a "political question" set forth in *Baker v. Carr*, 369 U.S. 186 (1962), where Justice Brennan indicated that a question is not justiciable if it lacks "judicially discoverable and manageable standards for resolving it." 369 U.S. at 217[3]

When the Thorough and Efficient Clause is considered, along with other aspects of the statutory scheme of education, it should be apparent that political hiring, teach-

---

[3] While justiciability is generally considered a question of law preliminary to judicial intervention, commentators are increasingly recognizing a fact-finding element in the determination of justiciability. The issue, arising predominantly in public law litigation, does not involve "adjudicative" fact-finding envisaged in the traditional private dispute resolution function of the courts, but rather involves "legislative" fact-finding necessary to assess and appraise the viability of alternative resolutions. While usual private party litigation is primarily concerned with assessing past conduct (adjudicative facts), public law litigation is concerned with prospective conduct (legislative facts) which must be ascertained before the "judicially discoverable and manageable standards" test of *Baker v. Carr* can be met. *See generally* Chayes, *The Role of the Judge in Public Law Litigation*, 89 Harv. L. Rev. 1281 (1976).

er tenure, irrational certification requirements, lack of school consolidation, and a host of other considerations, which would present "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion," *Baker v. Carr, supra* at 217, make it impossible to decide these issues without "the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Baker v. Carr, supra* at 217.

The courts can act upon a question such as the one presented in this case only when it is possible to remedy the situation by an order operating upon a discrete aspect of the problem. The lower courts will not find any aspects of the problem of substandard schools which taken alone, under the Thorough and Efficient Clause, can be acted upon by a court order without thereby implying that the courts must, in order to carry out their mandate, run the schools. If they find the financing system improper they cannot properly order the Legislature to raise taxes. This latter difficulty involves "the inherent limitations of the judicial process, arising especially from its largely negative character and limited resources for enforcement." *Rescue Army v. Municipal Court of Los Angeles*, 331 U.S. 549, 571 (1947). Furthermore, where a facet of a given total problem is susceptible of court resolution, but such resolution aggravates, distorts, or intensifies the magnitude of other aspects of the total problem which must then be left for resolution by another branch of government, (the water balloon problem) there is a dangerous possibility of "a court's undertaking independent resolution without expressing ... the respect due coordinate branches of government." *Baker v. Carr, supra* at 217.

The courts' inability to resolve many public issues such as the one before us is compounded by the problem of interest representation. Public law litigation has wide impact and, therefore, seems to necessitate representation of all who will be affected by its resolution; however, no reliable criteria have yet been found for identifying the affected interest, "apart from the decibel of the

protest." Chayse, *The Role of the Judge in Public Law Litigation*, 89 Harv. L. Rev. 1281 at 1311 (1976). It should be obvious that the traditional adverseness necessary to "[sharpen] the presentation of the issues" envisaged by *Baker v. Carr* is absent when the named defendant is either in reality not adverse or, at the very least, ambivalent. This is obviously the case before us; certainly the State Treasurer, State Board of Education, and State Superintendent of Schools are all in favor of "thorough and efficient" education. The adverse party, if there be one, is the taxpayer who is not a named defendant and cannot even be effectively represented by naming the President of the Senate and Speaker of the House of Delegates.

Consequently, it is with reluctance that I must dissent from the opinion of my learned colleagues, not because I am less outraged than they about the condition of West Virginia schools, but because I am neither Governor nor the entire Legislature. On remand I would hope that the lower court does not confine itself to an investigation of the problem of school financing alone; the children are entitled to a better inquiry than that if the courts are going to get into the question. The lower court should investigate, as suggested in the majority opinion, the relationship of tenure without need to demonstrate continuing competence, salaries which are not based on performance, lack of consolidation, inferior curricula, poor discipline, and a host of other ingredients which comprise the total problem. Only after adequate development of all those problems will the issue of finance be capable of being placed in proper perspective.